## MARABLE *v.* THE STATE.

1. Where the motive of an assassination was in all probability robbery, the fact that the deceased had money on his person shortly before he was killed is admissible in evidence against the accused, without showing by direct evidence that the latter had seen the money or knew the deceased had it, it appearing that he had, on the same day, been in company with the deceased, done some work for him, and might have had an opportunity of seeing his pocket-book and knowing that it contained money.

2. Confessions or criminating admissions made by the accused to a person having him in legal custody are not incompetent as evidence against him solely because the accused probably believed, in consequence of false representations made by his custodian to a crowd in his hearing, that the latter had come for him at the instance of his mother and intended to befriend him by employing counsel in his behalf if he was innocent, the confessions or admissions being made some hours afterwards, without solicitation, and being apparently free and voluntary, and intended only as an explanation by the accused of his reluctance to return to the State and county in which the offence was committed.

3. That a witness for the State who testified at the trial that he had been paid for all his services in arresting the accused and had no further interest in any reward offered for his apprehension and conviction, executed after the trial a power of attorney authorizing the person who had paid him to collect any reward to which he (the witness) was entitled, either severally or jointly with that person, is not cause for granting a new trial. The act of making such power of attorney is not necessarily inconsistent with the truth of the witness's statement in his testimony, but is easily reconcilable therewith.

4. Though the homicide may have been committed by striking the deceased with a hammer, and though the testimony as a whole might establish that theory, the admission of the accused that he struck him with a stick was competent evidence as being a part of his general admission on the subject. The admission might be partly true and partly false.

5. The evidence warranted the verdict, and there was no error in denying a new trial.                    *Judgment affirmed.*

June 13, 1892.

Criminal law. Murder. Evidence. Confessions. New trial. Before Judge MADDOX. Walker superior court. August term, 1891.

Marable was indicted for the murder of Evatt. The murder was alleged to have been committed with a certain blunt instrument to the jurors unknown. The defendant was found guilty, and sentenced to be hung. His motion for a new trial was overruled, and he excepted.

1. After all the evidence had been introduced and before argument was begun, the defendant moved to rule out all the testimony that deceased had any money, counsel contending that there was no proof that the defendant knew deceased had any money, the theory of the prosecution being that he was killed for his money. The court stated, "I will let you talk to the jury about whether he knew it or not,—whether he knew the facts"; and overruled the motion. Upon this ruling error is assigned, it being insisted that there was no evidence showing that defendant had any knowledge of whether deceased had any money about his person on the day in question, or that deceased had any money or was in the habit of carrying money; and further, that the expression used by the court in the presence and hearing of the jury, as to "whether he (meaning defendant) knew the facts," was an expression by the court as to what had been proved on this subject. There was no direct testimony that the defendant knew of the possession of money by the deceased. Upon this point it was shown

that the defendant worked for some time near where the deceased was engaged in running a little store. Deceased was killed Saturday night. On Saturday afternoon he and defendant were at a neighboring convict camp, delivering pork. Nothing was said in defendant's presence about paying for the pork, though something was said in his presence about the price. The night he was killed deceased was called from his house by some one who said for him to come down to the store, which was about seventy-five yards distant. Deceased went out and was found about ten or eleven o'clock that night lying in a gully in the road between his house and the store, with his head crushed. He died the next day, but never spoke after he was found. The deceased's daughter, who was a witness, did not know that any money was exposed to the view of defendant, who was at deceased's house on Saturday helping to kill hogs, and did not know that there was any conversation between defendant and deceased about money. The wife of deceased, who also was a witness, testified that her husband had money about the house that day; that defendant was not in the house at any time when her husband was counting or showing his money; that her husband kept his money in the bureau drawer in the house in a large pocket-book, and took the pocket-book out of the drawer and put it in his pocket that day and carried it off with him to the convict camp, defendant going with him; that she did not know whether he put the book back into his pocket or back into the drawer when he went to the camp; that she supposed that there was $240 or $260 in the book when taken off; that the book was in the bureau drawer that morning, but she did not see him get it out; that after her husband was found that night his pockets were searched and there were in them his watch, a little purse with $2.10 in it, his pocket-knife and a match-case; that no

search was made for the large pocket-book until the next morning, and it was about two months before it was found; that she did not miss it until the next morning; never thought of it until the next morning; that it was fifty or sixty yards from the house, and there was nothing in it when she afterwards saw it, except some receipts; that when her husband went off, if he carried the book, it was carried in his right breast coat pocket, and if buttoned, no one could see it; that she did not of her own knowledge know whether he took it with him that day, and never saw the book that day.   There was evidence that from the appearances about the body it seemed as if after deceased had been stricken down he had been partly turned over; that on the day deceased and defendant killed hogs a witness saw deceased take the large pocket-book from the bureau drawer and put it in his pocket, defendant not being present; that deceased went out to where defendant was, and defendant and deceased carried the hog on a pole about one hundred and fifty yards to the camp; that deceased put the book in his breast coat pocket, and the witness thought a person could see it if the coat was opened, and if closed thought one could tell that something was in the pocket; that deceased was accustomed to carry it in that pocket; that witness saw money in the pocket-book that day, and when deceased took the book from the drawer he turned around and opened it right towards witness, and witness saw there was a "right smart" of paper money in it; that deceased did not button up the coat before he left the house and wore no overcoat; and that any one could have seen the pocket-book as well as defendant could, if the book could be seen at all.

2. The court overruled a motion of defendant's counsel to rule out that part of the testimony of W. J. King, relating to a confession made by the defendant, upon the ground that if such confession was made it was under

the hope that it was better for defendant; that King had held out an inducement and hope that it would be better for defendant, that he, King, would employ lawyers for him and aid him in his defence, that he was his friend and was sent by his, defendant's, mother as his friend to take care of him. On the subject of a confession King testified, in brief: I know defendant and know his father and mother. He was raised in my county. I arrested him in Hampton county, S. C., working on a trestle. He was then passing under the name of Henry Lewis. I arrested him in the name of Roscoe Marable. As soon as he was pointed out to me I handcuffed him and marched him back to where his quarters were, to get his clothes. When I got back to the quarters I found there were about twenty-five or thirty negroes, and they seemed to be somewhat excited over the arrest and gathered up around me. I there told the crowd of negroes that I was a friend to Roscoe, that I would see him out of this charge if he was not guilty. I had previously read the requisition from the Governor of South Carolina to defendant. Either he or the person with whom he was working demanded it read. I told the crowd at the quarters that I was a friend to Roscoe, if he was not guilty of the charge I would see him out, and would furnish him a lawyer and would see him back. I think I told them his mother had sent me. I am pretty certain I did so tell them. I was in a bad crowd and wanted to get out the best I could. I then carried him about half a mile, handcuffed, in a buggy. I told him about some of the citizens of our county, but he at first denied being Roscoe Marable and said his name was Lewis. I told him he was Roscoe Marable and was from Savannah. He denied that, and said his name was Lewis and he was not from Savannah but was from Clinton, North Carolina. He was raised there, and I told him he was from Clinton and that his mother's name was Ann Marable. He said his

mother's name was Josephine, and I told him that was not true, etc.  He afterwards asked me about the lawyers of the place, and I told him about them.  He said he did not want to come here, he might fare rough here ; and I told him he would get a fair and impartial trial, and that I would see he got that, and if he was not guilty he would not be hurt, and that if he was guilty I did not see but one chance for him, and that was to jump the train, and after that· he said he did not want to go up there, for if he did he would fare rough.  I asked him why, and sometime afterwards he said, "I will tell you ; I got into a difficulty with that old man up there about some goods ; I bought some goods from him and paid him for them, and he wanted me to pay for them again, and I disputed his word, and he started towards me, and I knocked him down and struck him one lick after he fell."  I said, "You are charged with hitting that old man with a hammer; did you do that ?"  He said he did not, that he struck him with a stick.  I said, "You are accused of getting money from him," and he said he did not.  He said he did it by himself, stayed until next morning, did not know he had killed him, that he did not intend to kill him, and stayed until next morning, and took the train at a station.  He said he did not know he, deceased, was dead ; struck him on account of difficulty.  I carried him the night of the day on which he was arrested to a Mr. Long's, fourteen miles from Hampton.  He asked me about changing his name and what he would do, and I told he had better come on and not do anything about changing his name.  I told him I knew his name was Roscoe Marable, and the people up there knew him.  I read the requisition I suppose in about fifteen minutes after the arrest, and he stated what he did to me about two or three hours thereafter.  I made no promise nor offered any reward.  I told him, if he was not guilty

there would be no trouble. I asked him if this man's name that he killed was Everett, and he said, no, his name was Evatt. I pretended not to know or remember the name.—On cross-examination King testified, among other things : I told him he was from Savannah because I wanted him to acknowledge he was from North Carolina. It was not true. I never knew him in Savannah. It was not true what I told about his mother sending me down there. I did not tell him; I told the crowd, and he was present. It is true that I told him if he was not guilty I would befriend him, and I believe his mother would have paid me back.

3. Another ground of the motion was, because of "newly made evidence" contradictory of the testimony of King, and of Foster the sheriff of the county, "said newly made evidence being made since the trial and conviction of movant," which occurred on August 31, 1891, "and said evidence being made on the dates shown on the certified transcripts" attached to the motion. Of this evidence movant had no knowledge "or could have had at the date of his said trial." This "newly made evidence" consisted of a power of attorney given by King to Foster, to collect, receive and receipt for all rewards that might be due King individually, or in connection with Foster, for the arrest and conviction of defendant for the murder of deceased, dated September 1, 1891 ; affidavit of Foster, dated September 15, 1881, to the effect that he with King arrested defendant in Hampton county, South Carolina, on August 25, 1891, and that he and King were the only persons entitled to the reward offered by the Governor of Georgia for the arrest and conviction of defendant; and the certificate of the clerk of the superior court of the county in which the trial occurred, dated September 14, 1891, to the effect that Foster and King arrested and brought defendant to Walker county, and lodged him in the jail of that county ; and that Foster and King were entitled

to the reward offered for the arrest and conviction of defendant. Upon the trial King testified : I lived at Clinton, North Carolina. I made the arrest with the understanding I was to get $150; paid my own expenses, paid for outside information that I got, and paid all my expenses for information and travel. I have not been paid a cent to come here and testify; have been paid $150 for the arrest. I do not know where it comes from. I do not belong to a detective gang. I neither belong to a regular nor irregular detective gang, outside of myself. A man never objects to looking out for rewards. That is a "right smart" inducement if there is any money in it. I do not get a cent more, since I arrested this man. I could have gone home with the same money and come out; that was all that was expected of me, to make the arrest. I do some detective work; occasionally do about home. I came here at the request of sheriff Foster, and he guarantees me my expenses. My expenses were to be paid for me to come here and testify; I mean hotel and railroad fare. I turned prisoner over to sheriff Foster at Hampton, South Carolina, and never had charge of him afterwards. He paid me $150. I had done my work and received my pay. There was nothing to bring me, except the sheriff's request. So far as the reward is concerned I do not expect anything. I had no claim on the reward. Have no interest in the case. Before I made the arrest the sheriff paid me $30, and as soon as I brought the negro and turned him over, sheriff Foster paid me $120. I told him I did not expect any more of the reward, did not expect anything for coming here, out of the reward, more than I got; if you will guarantee my expenses, that I do not lose anything, I will go with you. The sheriff testified, that he received the prisoner from King at Hampton Court-House and paid him $150, which was in full for his services; that their contract by telegraph was for information pointing out defendant,

and for his arrest and delivery to witness; that King's contract with witness was to make the arrest and deliver defendant to witness; that King came at witness's request, and said he did not want to come; that King was to get no reward, and witness simply guaranteed his expenses, if the county would not pay it—his actual expenses.

4. Another ground was, because the testimony of W. J. King, relative to a conversation with defendant concerning the striking by movant of deceased, or any one else, with a stick, was immaterial and should have been excluded from the jury, the evidence showing that the deceased came to his death by a blow from a hammer. It was not stated in this ground that any motion was made to rule out this evidence.

5. The motion contains the ground that the verdict was contrary to law and evidence.

J. P. SHATTUCK and R. M. W. GLENN, for plaintiff in error.

W. A. LITTLE, attorney-general, W. J. NUNNALLY, solicitor-general, and COPELAND & DREW, contra.