STATE, RESPONDENT, *v.* LUCEY, APPELLANT.

[No. 1512.]

[Submitted June 26, 1900.  Decided July 16, 1900.]

*Criminal Law—Homicide—Evidence—Res Gestae—Motive—
Opinion — Evidence — Flight and Concealment — False
Statements by Defendant — Instructions — Practice—Iden-
tification of Instructions.*

1.  Where the state's theory was that a homicide was committed for the purpose of robbing deceased of money which defendant knew he intended to draw from the bank, evidence as to the amount of deceased's deposit was admissible, as tending to prove the motive.
2.  Any evidence that tends to show that the defendant had a motive for killing the deceased is always relevant; this rule is especially applicable to cases where responsibility for the homicide rests entirely upon circumstantial evidence.
3.  Proof of motive is not indispensable to a conviction, if the crime is otherwise clearly established.
4.  Where deceased, departing from home, took with him a satchel, leaving behind a packed trunk, testimony as to the similarity of the laundry marks on linen contained in a satchel found after his death and those on linen contained in the trunk was admissible to identify the contents of the satchel as deceased's.
5.  Conversation had between defendant and deceased, before starting out on a journey which, according to the state's theory, was planned by defendant to entice deceased to his death, was admissible as a part of the *res gestae* notwithstanding it had no apparent significance.
6.  Testimony of the sheriff that, when arrested, defendant turned away, "as though he was about to be devoured," was admissible, in the absence of a specific objection that the expression was vague.
7.  As an exception to the general rule excluding opinion evidence, a witness may be permitted to state his conclusion upon matters with which he is especially acquainted, but which cannot be specifically described.
8.  Evidence of efforts made to apprehend defendant after the discovery of a crime was admissible to show defendant's flight and concealment, from which guilt might be inferred.
9.  Proof tending to establish flight or concealment is always competent.
10. Where defendant accounted for his scratched appearance shortly after deceased's death by saying he had been ejected from a certain train, testimony of the train's crew that they were the only persons on the train, and that no one had been put off on the day in question, was admissible.
11. Evidence tending to show that after the homicide, defendant gave a false account of himself, is competent, as such fact was a circumstance strongly indicative of his guilt.
12. Where proper instructions were given, distinguishing murder in the first and second degrees, and telling the jury to find the degree, and there was no proof from which manslaughter could be inferred, failure to instruct the jury specifically that they might find defendant guilty of either degree of murder or manslaughter was not error.
13. A party cannot complain of an instruction which he himself requested.
14. Where in a criminal case, indorsements required by Code of Civil Procedure, Sec. 1080, subd. 7, as amended by Ses. Laws of 1897, page 241, providing that the court

shall mark each instruction "Given," "Refused," or "Modified," and all shall be filed as part of the record, were not made at the time of the trial, as the better practice requires, they may be identified subsequently by an entry ordered to be made in the minutes.

*Appeal from District Court, Silver Bow County; William Clancy, Judge.*

DANIEL LUCEY was convicted of murder in the first degree, and he appeals.   Affirmed.

### STATEMENT OF THE CASE.

On July 1, 1899, in the district court of Silver Bow county, the defendant, Daniel Lucey, was found guilty of murder of the first degree, and on September 26, thereafter was condemned to death.   From the judgment and an order denying him a new trial, he has appealed.

The evidence disclosed by the record tending to connect defendant with the homicide is entirely circumstantial, but no contention is made that it is not amply sufficient to sustain the finding of the jury.   It is sought to reverse the judgment and order appealed from upon alleged errors in rulings by the trial court upon questions arising upon the admissibility of certain evidence, and in a failure to properly instruct the jury upon the law applicable to the case.

The story of the crime, as shown by the evidence, is the following:   On September 2, 1898, the defendant and deceased, who had been residing in Butte, Montana, made preparations to go to the mining districts in the Coeur d'Alene country, Idaho, to seek work in the mines there.   About 3 o'clock in the afternoon they went together to the house of Michael Regan, a brother of deceased, where the deceased had been boarding.   In a few minutes the two left; the deceased stating that he was going to the bank, where he had a deposit of $550, to obtain expense money.   The bank was closed for the day, and the money was not obtained.   Returning presently to his boarding house, deceased borrowed from a friend, who also boarded there, $25, consisting in part of a $20 gold piece.   At about 25 minutes to 9 o'clock

in the evening the defendant came to the house, bringing a valise, which was almost empty. He remained about five minutes, during which he and deceased put into the valise the clothes of deceased which were deemed necessary for the trip. Defendant apparently took no extra clothing. The deceased had a trunk, but locked it and left it behind, after putting into it his other belongings, taking the key with him. He also put into the trunk his certificate showing the amount of his deposit in bank. Thereupon the two left in company, ostensibly to take the train for Anaconda, about 28 miles to the northwest. About 10:30 o'clock they were seen together at Rocker, three miles from Butte, on the wagon road, leading to Anaconda. There they entered a saloon, bought some beer and a bottle of whiskey, and then departed for Silver Bow Junction, five miles further along the road, intending to find lodging for the night there. Neither was seen thereafter until the following morning, when the defendant came down the Butte, Anaconda & Pacific Railroad, walking from toward Butte to Gregson station, carrying the valise. His clothes were wet and torn, and his face and hands scratched and bleeding. This station is 18 miles from Butte, toward Anaconda. He accounted for his condition by saying that he was on the early morning train, going from Anaconda to Butte, and had been thrown off by a brakeman, falling into the water at the roadside. He at once began to drink at a saloon near the station house, offering in payment a $20 gold piece. The Butte, Anaconda & Pacific Railroad connects Butte and Anaconda, winding down Silver Bow canon and along Deer Lodge river. At the mouth of the canon the roads turns west towards Gregson. During the forenoon of September 3d the body of deceased was found in Deer Lodge river, a short distance above the mouth of the canon. The front of the head and face was crushed in as if by a blow from a blunt instrument. The pockets of the clothing upon the body were turned inside out, except the watch pocket in the pantaloons. A $5 gold piece was found in this pocket. Nothing else of value was found. At a distance of 1280 feet

up the river, between it and the railroad, the ground showed evidences of a struggle. There were pools of blood by the track, and a trail of blood leading through a wire fence to the river, about 125 feet distant. The wire fence was broken. At the river bank, in the sand, were human tracks. Near the pools of blood were picked up stones having upon them clotted blood and human hair. On the trail leading to the river were picked up some small coins, and the trunk key belonging to deceased. The body was brought to Gregson about 11 o'clock in the forenoon by the same train from which defendant claimed to have been thrown in the early morning, the crew discovering it on the return trip. The defendant had remained there and continued his drinking until shortly afterwards, when he disappeared. Before going, he purchased a ticket to Butte. He left the valise at the ticket window in the station house. He was seen at Anaconda late the following night, but again disappeared; and though search was made and rewards offered for him, his whereabouts were unknown until April 17, 1899, when he was apprehended at Cripple Creek, Colo. The evidence does not disclose, except from defendant's own statement, whether the defendant knew that the deceased had money upon his person. The defendant knew of the amount of the deposit of deceased, and claims, also, that he knew of deceased's failure to reach the bank in time to withdraw any of it, as well as the fact that deceased borrowed expense money necessary for their intended trip.

*Messrs. Hamilton & Thresher*, for Appellant.

*Mr. C. B. Nolan, Attorney General*, for the State.

**Mr. CHIEF JUSTICE BRANTLY**, after stating the case, delivered the opinion of the court.

1. Exception is taken to the action of the court in permitting the witness, Kate Regan, the sister-in-law of deceased, to state, over the objection of defendant, how much money the deceased had on deposit in the bank, and what evidence he

held of such deposit. The theory of the state was that the homicide was committed for the purpose of robbery. The evidence on the part of the state up to this point tended to establish this theory. It showed that defendant and deceased had been engaged in the afternoon of September 2d, in preparing for their proposed journey to Idaho; that the defendant probably knew of the amount of money deceased had on deposit, and that he held a certificate for it. It also showed that he probably knew that deceased intended to withdraw the money, or a part of it, during the afternoon; for the deceased came with the defendant to the house of the Regans during the afternoon, and after staying a few minutes, the two hurried away again together; the deceased stating to the witness that he was going to the bank to get money for his expenses, and to pay her for board. Evidently their appearance at the house at this time was to secure the certificate, in order to draw the money. When deceased returned alone, presently, he told the witness that he had failed to get the money, because the bank was closed, and that he had borrowed $25. The evidence was clearly admissible as tending to prove motive. It furnished facts from which the jury could draw the inference of robbery, and the state was entitled to this inference. "Any evidence that tends to show that the defendant had a motive for killing the deceased is always relevant, as rendering more probable the fact that he did kill him." (Underhill on Criminal Evidence, Section 323.) This rule is especially applicable to cases like the present, where responsibility for the homicide rests entirely upon circumstantial evidence. (1 McLain, Cr. Law, Section 416; *State* v. *West*, Houst. Cr. Cas. 371; *People* v. *Ah Fung*, 17 Cal. 377.) The presence or absence of it is not conclusive, however, but is to be considered as any other evidentiary fact bearing upon the ultimate question of the guilt or innocence of the defendant, and is more or less significant in the light of the facts of the particular case. The finding of a motive is not indispensable however. Were this true, it would oftentimes be impossible to secure conviction; for such is the nature of the human

heart, and so various are the springs of action hidden therein, that it is often impossible to fathom it and assign any motive whatever to the act under consideration.   Under such circum-stances it is the duty of the jury to convict, notwithstanding the lack of proof tending to show motive, if the crime is other-wise clearly established.   (*Pointer* v. *United States,* 151 U. S. 396, 14 Sup. Ct. 410, 38 L. Ed. 208; *Johnson* v. *United States,* 157 U. S. 321, 15 Sup.. Ct. 614, 39 L. Ed. 717.) Whether the evidence complained of as improperly admitted, was sufficient to satisfy the jury that the murder of Regan was committed for the purpose of robbery, or not, it was proper matter for consideration.   (1 McLain, Cr. Law, Section 416; *State* v. *Crowley,* 33 La. Ann. 782; *Howser* v. *Com.* 51 Pa. St. 332; *Early* v. *State,* 9 Tex. App. 476; *Kennedy* v. *People,* 39 N. Y. 245; *Marable* v. *State,* 89 Ga. 425, 15 S. E. 453; Kerr on Homicide, Section 472.)   The relevancy and materiality of this evidence were not affected by the subse-quent admission of the defendant, when sworn as a witness, that he knew all about the financial condition of deceased, and of his failure to obtain any money from the bank.

2.   After the same witness had identified the articles of clothing taken from the valise left by defendant at Gregson, on the morning after the homicide, the court permitted her to recount to the jury the opening of the trunk which deceased had left at her house.   She stated that this was accomplished by means of the key which was shown to have been found on the trail leading from the supposed scene of the homicide to the river.   The witness then proceeded, over the objection of defendant, to enumerate the articles found in the trunk, and to compare the laundry marks upon some shirts and collars taken from among them with the same character of marks up-on others found in the valise.  · The marks were shown to be the same, and thereupon all the articles were exhibited to the jury.   Defendant alleges that this was prejudicial error.   The evidence was properly admitted.   The defendant took the va-lise to Gregson station, and left it there, where it was after-wards found.   It was competent to identify the articles found

in it as the property of the deceased, both upon the question
of motive, and as tending to corroborate the statements of
witnesses who identified the defendant himself as the person
who came to Gregson from the direction of the place, where
the body of deceased was found.   The identification could
properly be made by the testimony of the witness, who knew
the articles, or by way of comparison of the laundry marks
upon them with those upon the articles known and admitted
to belong to deceased, or by both methods.   The identity of
these marks was also strongly corroborative of the statement
of the witness, who claimed to know and recognize the articles
taken from the valise as the property of deceased.

3.   Exception is also taken to the part of the statement of
the witness, Maggie Donohue, in which she related the sub-
stance of a conversation between defendant and deceased while
engaged in packing the valise at the house of Michael Regan.
Something was said about how deceased would manage to get
his trunk to the Coeur d'Alene country, where they were go-
ing.   Defendant told deceased that after they had settled
down, he (defendant) would send for his wife, and that she
would call at Regan's for the trunk and take it with her.   This
statement was clearly a part of the *res gestae.*   The parties
were engaged in preparation for their proposed journey, upon
the first stage of which the homicide was committed.   Upon
the theory (which in the light of all the proof, is not improb-
able) that the defendant deliberately enticed his unsuspecting
companion to an untimely death, the jury were properly al-
lowed to consider all that was then said and done, as a part of
the entire transaction.   It matters not that the particular re-
mark had no apparent significance; nor does it alter the case
that the defendant subsequently testified that he was never
married.   The office of the jury was to inquire into the whole
transaction, from the time of its inception until its completion
and to draw therefrom their own conclusion as to the guilt or
innocence of the defendant.   (Kerr on Homicide, Section 429;
*People* v. *Potter*, 5 Mich. 1; 1 McLain, Cr. Law, Section 411;
*State* v. *Donelon*, et al 45 La. Ann. 744, 12 South. 922.)

4.   Jerry D. Murphy, the undersheriff of Silver Bow coun-
ty, who went to Cripple Creek, Colo. to bring the defendant
back to Montana after the arrest, was sworn as a witness, and
testified as to the appearance and behavior of the defendant at
the time the witness first saw him.   The witness was asked to
describe defendant's actions.   He replied:   ''He was shaking
and very. nervous, and went by me and turned his head away
from me, as though he had run onto something he didn't want
to see.   He turned right away, as though he was about to be
devoured.''   Counsel moved the court to strike the last sen-
tence of his answer from the record, but assigned no ground
for the motion.   The motion was denied.   Exception is taken
to this ruling.   The demeanor of a defendant at or about
the time he is charged with a crime is always proper matter
of evidence to go to the jury as indicative of a guilty mind.   So,
also, the jury may, for the same reason, be permitted to con-
sider his acts and conduct at the time of his arrest, and to draw
such inference from them as experience and observation of hu-
man conduct may suggest.   Caution should be observed in
considering such evidence, however lest an inference of guilt
be improperly drawn from the fear and excitement naturally
evinced by an innocent man when he is suddenly confronted
with a serious charge, and is overcome by contemplation of the
possible consequences to himself and family.   (1 Rice on Ev-
idence Section 318; *Greenfield* v. *People*, 85 N. Y. 75; *McAd-
ory* v. *State*, 62 Ala. 154; Bishop's New Cr. Proc. Section
1249.)   The evidence elicited was clearly competent.   ( *Com.*
v. *Sturtivant*, 117 Mass. 122; Wharton's Cr. Ev. Sections 459,
460.)   The whole statement is a compound of fact and con-
clusion,—a ''shorthand rendering of the facts'' as they were
observed by the witness,—and falls within the exception to the
general rule excluding opinion evidence, under which a wit-
ness may be permitted to state his conclusion upon matters
with which he is especially acquainted, but which cannot be
specifically described.   (*Id.* Section 460.)   The use of the ex-
pression, ''as though he was about to be devoured,'' was per-
haps objectionable on the ground that it is vague and conveys

no definite idea. But, in the light of the other part of the statement, it is reasonably certain that the witness intended to convey the idea that the defendant appeared to be in fear and that the jury so understood him. The defendant suffered no prejudice by the ruling, though the expression might well have been rejected if the motion had been made upon the proper ground.

5. Proof was admitted showing the effort made by the officers of Silver Bow county immediately after the homicide, and subsequently up to the date of the arrest, to find and apprehend the defendant; and, as a part of this proof, it was shown that a reward was offered, and that notices containing a description of defendant were sent to different places throughout the country. All this evidence was proper. It tended to show flight and concealment on the part of defendant, both of which are circumstances ordinarily indicating guilt. (1 Rice on Evidence, Section 318; *People* v. *Ogle*, 104 N. Y. 511, 11 N. E. 53.) The flight or concealment may be apparent only, and may be susceptible of explanation, but proof tending to establish either is always competent.

6. The persons constituting the crew which took the early morning train from Anaconda to Butte, from which defendant stated he had been thrown, when accounting for his condition on reaching Gregson, were all sworn, and permitted to state that they were the only persons on the train, and that no one had been put off on that particular morning. That this evidence was competent does not admit of discussion. It tended to show that defendant gave a false account of himself at Gregson, and was a circumstance strongly indicative of his guilt. (*State* v. *Benner*, 64 Me. 267; Will's Circumstantial Evidence 108, 109.)

7. Counsel complain that the trial court committed error prejudicial to the defendant in failing to instruct the jury specifically that they were at liberty to find the defendant guilty of either degree of murder or manslaughter. The information charges murder of the first degree. An examination of the instructions shows that the court, after giving to the jury

the statutory definitions of all grades of homicide, submitted, also instructions clearly and correctly distinguishing murder of the first and second degrees. They were also instructed that, if the proof justified a verdict of guilty of the crime charged in the information, they should find the degree. There was no proof tending to establish facts from which the jury could infer the crime of manslaughter. Under the proof the defendant was guilty of murder, or he was innocent. This being the case, the instructions were sufficient. The court was not required to leave to the jury the question as to whether the defendant was guilty of manslaughter. (*State* v. *Calder*, 23 Mont. 504, 59 Pac. 903; *State* v. *Fisher*, 23 Mont. 540, 59 Pac. 919.) For while, under the rule as stated in *State* v. *Fisher*, it was necessary to instruct upon murder of the second degree, in order that the jury might be left to consider the question of the presence or absence of deliberation, it was perhaps, not necessary for the court to go further, and define manslaughter, although it was entirely proper to do so. By the definition of this latter grade of homicide the jury were given a clearer understanding of the elements necessary to constitute the only crime of which the defendant could properly be found guilty; that is, murder of the first or second degree. No juror, after hearing or reading the instructions as a whole, could have been mistaken as to his duty in the premises; nor could he have understood that the court intended to exclude from his consideration the question as to whether the defendant was guilty of murder of the second degree. In the particular under consideration, the instructions furnish no ground for complaint.

8. Among the instructions are two paragraphs submitted at defendant's request. Complaint is made that they are comments upon the weight of the evidence, and were therefore, prejudicial. It is not necessary to quote these paragraphs or to comment upon them. Conceding that they are open to the criticism counsel make, the defendant cannot complain. (*Territory* v. *Burgess*, 8 Mont. 57, 19 Pac. 558; *Newell* v. *Meyendorff*, 9 Mont. 254, 23 Pac. 333, 8 L. R. A. 440.) They are

not inconsistent with the other instructions, and are favorable to the defendant, rather than the contrary.

We take occasion in this connection to remark upon the duty of trial courts in regard to the identification of instructions. Under the various provisions of our Code of Civil Procedure, and the Penal Code, the instructions given and refused are deemed excepted to, without a bill of exceptions, and are made part of the judgment roll and the record on appeal. (Code of Civil Procedure, Sections 1080, 1151, 1176, 1196; Penal Code Sections 2070, 2176, 2229; *Wastl* v. *Montana Union Railway Co.* 24 Mont. 159, 61 Pac. 9.) The same rule applies to both civil and criminal cases. Subdivision 7 of section 1080 of the Code of Civil Procedure, as amended by the act of 1897 (Ses. Laws of 1897 p. 241), provides: "The court shall either give each instruction as requested, or positively refuse to do so, or give the instruction with a modification, and shall mark or endorse upon each instruction so offered in such manner so that it shall distinctly appear what instructions were given in whole, or in part, and in like manner those refused. All instructions given by the court must be filed, together with those refused, as a part of the record." The amended section is identical with the old section, except that the old section required parties requesting instructions to sign them, while this provision is omitted from the amended section. The amendment was overlooked in the discussion in *Wastl* v. *Montana Union Railway Co. supra*, because not called to our attention, but this in no wise affects the decision upon the point presented. The provision of the subdivision quoted requires the trial court to identify the instructions as those given to the jury, either in the form requested, or as modified, as well as those requested and refused. This identification is directed to be made by the indorsements upon the instructions themselves, and the clear implication is that the indorsement should show, also, at whose instance the particular instruction was given. In this way it is made clear to this court what reviewable errors, if any, have been committed by the trial court to the prejudice of the complaining party.

Being thus identified and filed with the record, as required, under the section cited they are a part of the record on appeal. As was said in *Wastl* v. *Montana Union Railway Co.*, they may also be identified and made a part of the record by bill of exceptions. Inasmuch as the minutes of the trial in criminal cases must also be a part of the judgment roll, and record on appeal (Penal Code, Section 2229), we see no reason why, if the indorsements are not made under the requirements of section 1080, *supra*, the identification may not be made subsequently by an entry in the minutes of the trial. In the present case, the record failing to properly identify the instructions, upon proper motion by the attorney general, the identification was permitted to be made by the court below, by an order made as of the date of the trial, and the record amended accordingly. Much the better practice, however, is for the court to follow the statute in spirit as well as in the letter, and make the proper indorsements at the time of the trial.

9. Several other assignments of error are made by counsel. We have carefully examined them all    They are without merit.

The judgment and order appealed from are therefore affirmed.                                            *Affirmed.*