MILLER *et al. v.* THE STATE.

No. 9503.   APRIL 11, 1933.

*Mundy & Mundy,* for plaintiff in error.

*M. J. Yeomans, attorney-general, S. W. Ragsdale, solicitor-general, B. D. Murphy* and *J. T. Goree, assistant attorneys-general,* contra.

BECK, P. J.   Gordon Miller and John Miller were jointly indicted for the murder of Robert Owens, and were tried jointly. The jury returned a verdict of guilty against both, with a recommendation.   They thereupon filed their motion for a new trial, which was overruled, and to that judgment they sued out a writ of error to this court.

1.   Movants insist, and their counsel urge in their briefs, that the verdict was contrary to the evidence and that the evidence was not sufficient to authorize the verdict.   But, after consideration of all the evidence offered by the State, we have reached the conclusion that the jury were authorized to return the verdict thus excepted to.

Dr. C. V. Wood, a witness for the State, testified that he was a regular practicing physician and surgeon, and had been for thirty-four years; that he made an examination of the body of Robert Owens the day after he was killed; that he "removed the top of his

skull, lifted it off the brain, and on the right side just above the right ear, on the inside, found a fracture of the inner table of the skull. It was shattered, broken, and right under that there was a clot of blood pressing on the brain half as large as my fist, or may be a little larger. External violence caused the death of that young man. It could have been caused from a lick of some blunt weapon. It could not have been caused from a lick of the ordinary fist of a boy weighing 130 pounds. Whether a party after having received a lick of that kind could go for a mile or more before he would become paralyzed to such an extent that he could not travel further, I have seen them stay on their feet 24 hours and then die. . . The artery broken was evidently a branch of the middle meningeal, just above the ear. The clot was at least $2\frac{1}{2}$ inches long, on the inside—pressing on the brain. The external table of the skull was not fractured, but the internal table was. . . The external table in this boy I would say was one eighth of an inch thick. It is bone, hard bone. . . I could tell that the injury I examined on the head was caused from violence; the inner table of the skull was broken like an eggshell. . . I would say the lick was with some blunt instrument. It could not be done with the kick of a rubber-heeled shoe, or the bottom of a shoe, or any part of the shoe. It would depend on how big a man was, and how he kicked him. He would have to get on him and stamp him, to do that much trouble."

Dr. J. W. Good, another physician, testified, in part: "I have been practicing medicine and surgery for a number of years. I have a hospital here in Cedartown. In my opinion, that blood-clot in the head was caused from a ruptured blood-vessel. The rupture of the blood-vessel was caused from a lick of some description; it couldn't have been caused from any other cause. There was no appreciable sign of violence outside of the head. I don't think anybody could have inflicted the wound I found with his fist; it would be impossible. The instrument or weapon used would be likely to produce death; it did produce death. The outer table of the skull is very strong, very thick, and especially at that point it is the second thickest part of the skull. . . After a party had been struck, it would have been possible for him to have gone a mile or two before the blood coagulated sufficiently in the head to cause paralysis and kill him; it might take place hours afterwards; it could."

Lois Nichols testified, in part, as follows: "I have known Gordon Miller and John Miller about three years. I live in the same community. I went with Gordon [Miller] awhile; I went with him about a month. I went to a pound supper on the first Saturday night in October of this year, at Mr. Clarence Ledford's. I walked down there with Alice and Gordon Miller, but Gordon wasn't with me. He did not have a date with me. Robert Owens had a date to go home with me that night. He started with me. We had gone about a half mile, I guess, before anything occurred. I left the party with Robert. We all left together. Robert was with me. Me and Alice and Gordon and John and Robert left together. Robert was on my left side. He had hold of my arm. Alice Miller was on my right-hand side. We were all walking up the road together that way. John and Gordon were behind; I don't know how far; about 100 yards, I guess. Walking on the highway, Gordon slipped up behind us and hit Robert in the head, right over his right ear. He didn't say anything to him before he hit him. I did not know Gordon was there until after he had hit Robert. He used curse words and said, 'I will show you who goes with her.' Robert staggered to the other side of the road, and then John struck him. John struck him on the shoulder somewhere. Then me and Alice —they went to throwing rocks down the hill—and me and Alice went walking on, and in about a minute they came on and passed us. Just before we got home, Gordon said he was sorry the trouble came up between him and Robert, but he might kill him before it was over. I don't know what Robert did or said to cause Gordon to hit him. I didn't hear him say a word after he was hit. If anything occurred at the party, I didn't know it, between Gordon and Robert. John was at the party. The party was about two miles, I imagine, from my house. Robert made the date with me on Wednesday. I know where Robert lived. He lived beyond the house where the party was. Gordon said: 'God damn you, I will show you who goes with her.' This trouble occurred in this county, October 1st, 1932. I do not know what he hit Robert with; it popped. Gordon Miller came to my house the next day. Mr. Paris brought him there. Gordon said he hit him in the head with his fist; he didn't deny that. John said he didn't hit him. I saw John hit him. He was not making any fight toward John; he just staggered. I didn't hear Robert say anything about wanting to fight.

We were on that part of the highway between Cedartown and Rome.
. . It was a dark night. The moon was not shining. I don't
remember whether it was clear or cloudy. I could see pretty well.
I didn't see Robert Owens walk off from there. I didn't see him
leave. Me and Alice were walking on. I left them throwing rocks,
Gordon and John. John was not throwing rocks. I don't know
what he was doing. I didn't see him. I didn't see him do any-
thing that night. He didn't talk any, so far as I heard. Q. Did-
n't say anything from the time he left the party to anybody? A.
I didn't see him any more after John hit him, I didn't look down
the road. I don't know what Gordon hit him with. I didn't see
any blood, or sign of blood. Gordon's sister is named Alice. She
and I just walked off up the road, leisurely. Gordon knocked him
loose, and he staggered to the other side of the road, and John hit
him. I don't know what John hit him with. He was hitting at
him with his fist. I don't know whether he had anything in his
hands or not. He hit him on the shoulder, in front. That was on
the side of the road from where we was. They were back of—kind
of in the ditch. I don't know whether either one was in the ditch
or not, they were just at the far side of the road—just on the edge
of the road, I mean. That's a pretty wide road there. It was still
the level part of the road. As to whether John and Robert were
standing on the edge of the road, and face to face when they had
the trouble, they wasn't standing, I don't reckon. They was face
to face. I didn't see Robert standing there. He was when John
hit him. I didn't see Robert run, but I saw Gordon and John
throwing rocks down the hill. I didn't see any rocks hit him. I
didn't look down the road to see whether Robert run, or anything.
I just know they were throwing rocks. I didn't say anything to
Robert when he left. I was scared a little. No, sir, I didn't know
what Gordon hit him with, if he hit him at all. I never did see
Robert fall while I was there. Whether I thought there was any-
thing wrong when I walked off, or I would have helped them, I
don't know. After we left the party, Gordon and John got about
100 yards behind. Alice was with us all the time. Alice was there
when everything happened that I have been talking about. In other
words, she was there when John and Gordon caught up with us. I
don't know whether John and Gordon ran to catch up with us or
not. I didn't even know that they were right behind us. We were

walking on the left-hand side of the road. She could see every-thing that happened as well as I could. Alice said, 'Boys, don't do that,' and I was begging them not to throw rocks. We were walk-ing on when Alice said, 'Boys, don't do that.' As to whether Rob-ert was throwing rocks too, I didn't see him throw any. Gordon knocked Robert, and he staggered to the other side of the road. Then John hit him, and I didn't see him any more. I was on one side of the road, and John was on the other, when he hit Robert. Robert had crossed the road. I don't know what John hit Robert with. John hit him with his fist. I didn't see any stick, or any-thing else, in John's hands. I didn't see no rocks. I just saw them doing like that [indicating]. The reason why I said they were throwing rocks, I believe they were throwing rocks. I didn't see any, or hear any rocks. I haven't been talking to anybody about the case. Nobody was hit with rocks, as far as I know. The reason I thought they were throwing rocks is just because they were doing that way [indicating]. As to whether John ran across the road, or walked across, he was over there by the time Robert was hit. John went ahead of Robert across the road; he was over there when Robert staggered over there. I didn't hear Robert complain about being cut or hit. I didn't hear him say a word. Robert was 17 years old. He was larger than John, he was fleshier. I expect he was a little heavier than Gordon. I didn't fall down, nor faint, nor run. I stayed with Alice Miller. I walked along up the road just like nothing had happened; in fact, I didn't know anybody was hurt, no sir." Other evidence corroborated the testimony of Lois Nichols.

J. C. Paris, for the State, testified: "I have been an officer for some little time. I arrested Gordon Miller on Sunday after the body of Robert Owens was found over there close to his home. He was between his house and the Rome highway; he said he was com-ing from church. I told him what I wanted him for. He said they had not had any trouble. After I went by and got this girl, Lois Nichols, I asked her in his presence about the trouble, and she told how it was, and then he said they had some trouble, had a little fight. He said he hit him. He said he hit him in the head, I be-lieve he said, side of the head or back of the head; he hit him any-way. That was after Miss Nichols faced him and told him they had had trouble. That was Sunday after the trouble happened Sat-

urday night. It excited him a right smart little; he was nervous and seemed to be pretty badly excited. I believe it was something between 11 and 12, may be 12 o'clock, somewhere along there. I couldn't say exactly just what time it was. The body of Owens was already found at that time. I arrested John too; he was on the same road, except he was a little nearer home. In the presence of Gordon, John said that his brother knocked him. In the scrap, he said, his brother knocked him over to him, and the fellow hit him, and he struck him back. He said he hit him, too; he said this fellow struck him. I don't remember about the fighting business, what was said about that."

Alice Miller, who was in company with Lois Nichols at the time Robert Owens was struck, was introduced as a witness for the defendant. Her testimony contradicted that of Lois Nichols in nearly all material particulars. Numerous witnesses were introduced who testified to the good character of the defendants for peaceableness. Certain witnesses testified that as they were driving along a road they saw a fight between persons. One of them identified one of the persons as Robert Owens, but there was no testimony showing that either of the defendants was there.

The defendant Gordon Miller made the following statement: "Well, on Saturday night we went to the party, and I had a date with Lois Nichols to go with her to the party, and Alice wanted to go, and she went with me and John. Me and Alice and Lois went to the party together. I was with Lois, and when we started back I started with Lois, and John and Alice was behind, I don't know exactly how far, and when we got up the road about half a mile there was somebody. I heard them walking behind us, and I thought it was them. He just run in between me and Lois and shoved one each way, and as he shoved I hit at him. I hit him somewhere in about the chest, and then Lois hollered, and I went to see about her, and I never saw this man no more. I don't know where he went to; and then by that time John and Alice had caught up with us, and we went on together, me and Lois and John and Alice; they come on behind, and we turned on. We didn't meet no cars. We met one just before we turned off, and when we got to the road me and Lois turned off to go to her house, and I went with her there, and I left her up there and come on back down there, and Alice and John was waiting for me, and then we all went home and went

to bed, and John slept with my dad, and I slept in the other room right next to them; and that's all I know. Gentlemen of the jury, I am not guilty of the crime they have got me charged with. I didn't do that."

While the evidence of the principal eye-witness introduced by the State was contradicted by the testimony of Alice Miller, it was a question for the jury to determine whether Lois Nichols' testimony was to be accepted or not. They evidently gave credence to her testimony, as they had a right to do; and that testimony, read in connection with the testimony of the two physicians who performed the autopsy on the body of the deceased, authorized the jury to find that the two defendants were following at some distance Lois Nichols, Alice Miller, and Robert Owens, and came up behind Robert Owens, and that one of them struck him a violent blow upon the head with such a weapon and with such violence as to break the inner table of the skull and cause an extravasation of blood, thereby forming a clot on the brain, which resulted in death; and the jury were authorized to find that this blow was struck without provocation, and that the killing was murder. The jury were also authorized to find, from the fact that the two defendants, Gordon Miller who was twenty-six years of age, and John Miller who was seventeen years of age, followed the deceased, and the two young women whom they saw accompanying him, for some distance, and then came up to them with the common purpose of making an assault upon the deceased. There was evidence indicating that Gordon Miller had been going with Lois Nichols for some time. Jealousy may have been his motive for making the assault which resulted in the homicide; and this court is of the opinion that the verdict is authorized by the evidence.

■ The omission of the court to give in charge to the jury the law on the subject of voluntary manslaughter, which is the basis of one of the special assignments of error, was not error. There is no evidence authorizing a charge upon that subject. If the statement made by Gordon Miller to the jury authorized a charge upon voluntary manslaughter, there was no request to give such instruction. Failure to charge upon a theory of the case presented only by the statement of the defendant is not ground for reversing a judgment refusing a new trial, where no timely request was presented for a charge on that subject.

■ Error is assigned upon the following charge of the court: "If these two defendants entered into a conspiracy and agreement, a combination, to kill the deceased, and in furtherance of that agreement or conspiracy they went together to carry out that agreement and conspiracy, then the one who did not inflict the mortal wound, if one was inflicted, if he was present when it was done or near by aiding and abetting, carrying out the conspiracy, then he would be just as guilty as if he himself had inflicted the mortal wound." It is insisted that no evidence of a conspiracy was introduced that would authorize a submission of the matter of a conspiracy on the part of the defendants to commit the alleged crime. If the jury believed the testimony of Lois Nichols that these two defendants followed her and Robert Owens and Alice Miller for a distance of 100 yards, and then came up to where Lois Nichols and her companions were, and one of them struck Robert Owens a violent blow, with a deadly weapon, on the head and knocked him across the road, so that he staggered to where the other defendant was, and this other defendant hit him, and then as the deceased ran away both of the defendants joined in throwing rocks and making a further assault upon the deceased, the jury had a right to find that there was a conspiracy. It was not necessary for the State to prove, by any of the sayings of the defendant made before the homicide, that they were conspiring to make an assault upon the deceased; but the fact of a conspiracy could be inferred from circumstances; and the circumstances testified to by Lois Nichols authorized the jury to find that there was a common intent to make an assault upon the deceased, and that when Gordon Miller struck the fatal blow the other defendant was aiding and abetting him. While the evidence does not seem to the court very strongly to show that there was a conspiracy, we can not say that the jury were not authorized to find that the brothers were acting with a common purpose, and that a conspiracy had been formed to assault the deceased.

■ Again, exception is taken to the following charge of the court: "The law of admissions applies where there is some evidence, or where the jury may find some evidence, of admissions or circumstances that tend to incriminate the defendant. In other words, any admission or inculpatory circumstance, if you find any admissions were made by the defendants, or either of them, as to any fact or facts illustrative of the guilt or innocence of the

accused, you may consider this circumstance in connection with and in light of any other fact, if there be any such established to your satisfaction, bearing upon the guilt or innocence of the accused, and from all the testimony determine the defendants' guilt or innocence." It is contended that this charge was error, because there was not sufficient evidence to authorize an instruction to the jury on the subject of admissions as. to John Miller, and that any admission made by Gordon Miller did not and could not be legally binding upon John Miller, as it did not appear from the evidence that any admission made by Gordon Miller was made during the progress of the conspiracy, if any. This exception might be good but for the fact that the court charged the jury distinctly that "if you find that admissions have been made by one of the defendants, out of the presence of the other, of course you would not weigh such admissions against the one who did not make them." This last passage quoted from the charge entirely excluded from the consideration of the jury the admissions of one as evidence against the other.

■ The following charge of the court was excepted to: "If you find that one of the defendants, or both of them, had formed this conspiracy, and that they were both present, and one, with a weapon likely to produce death, inflicted a wound on the deceased in a manner and in a way and under circumstances that would naturally tend to kill, then malice would be presumed from the use of a weapon and the manner of its use." Of course the language in this charge, "If you find that one of the defendants, or both of them, had formed this conspiracy," was not apt; but this inaptness could not have misled the jury. The jury could not have understood the court, in view of all the charge, to mean that one man could form a conspiracy by himself. Except for this inaptness or inaccuracy, the charge was a substantially correct statement. of the law.

*Judgment affirmed. All the Justices concur.*