1. Conviction of murder was authorized by the evidence.
2, 3. Rulings on admissibility of evidence over objections.
4. Under the evidence and the statement of the accused at the trial, either he was justified as he contended, or he was guilty of murder. The court did not err in not giving in charge the law of voluntary manslaughter.
 No. 14248. OCTOBER 13, 1942.
Isaac Irwin was found guilty, without a recommendation, of the murder of J. N. Perdue by shooting him with a pistol on February 1, 1942. The defendant excepted to the refusal of a new trial.
Exception was taken to the admission of testimony for the State by J. D. Boone, a groceryman, as to the practice of the deceased in carrying large sums of money on his person, that "whenever he paid his bills he always had plenty of money;" that the deceased "would have just a billfold full of fives and tens and twenties and fifties, every time [witness] had a chance to see it;" and that this occurred "whenever he paid for his bill." Objection was taken to this testimony as irrelevant, too remote in time and place to have any probative value; and as inadmissible to show motive, unless the accused had notice of the custom or habit of the deceased as to carrying such sums of money; and on other grounds. The court ruled: "I will sustain your objection in so far as involving any custom. I will overrule it as to the other grounds, and will entertain a motion to rule it out unless the State connects it up." The record does not show any subsequent motion to rule out this testimony. Counsel for the defendant brought out on cross-examination of this witness the following: "As to how long it has been since I had any business transaction of the nature I have just outlined with [the deceased], I borrowed $100 in 1936. At different times he has given me money for the church, and I have seen his pocket-book. That was not a business transaction. The last transaction was in 1936." The brother of the wife of the deceased (who also was killed with a pistol at the same time and place) testified. without objection, that when she visited in Alabama during the *Page 691 
summer before the homicide, he saw her with a canvas bag containing a stack of fifteen or sixteen hundred-dollar bills, twenties and tens, amounting to about $1600. There was evidence for the State, in which it appeared that the defendant did not move from Kentucky to Georgia until the last of October or first of November, 1941, preceding the homicide on February 1, 1942; that after he came to Georgia he lived with a couple for whom he worked, in a home purchased by them from the deceased, and that the deceased and his wife lived in this home before their purchase of the residence where they were killed.
There are like exceptions to similar testimony by the same witness. Similar exceptions are taken to testimony of E. G. Sherrill for the State, that he had seen the deceased with large sums of money on his person "occasionally all during the period of time [witness] had business with him;" that this "was in 1928 or 1929, [witness didn't] just remember when it was, it was back in that period of time." Immediately after this testimony on examination by the State, the witness said: "December of last year, just before Christmas [1941], he was in the store, and made a purchase and pulled out his pocket-book out of his hip pocket. He opened up his pocket-book and ruffled the bills up in it, . . and he had a great deal of bills in there. I don't know how many. I could see some ten or twelve that he ruffled over; they were hundreds; ten or twelve one-hundred dollar bills, and there was more than that in the pocket-book. . . That was . . about the middle of December of last year, 1941. On other occasions I have seen him with large sums of money on his person, when he would pay his bill or have a business transaction with me; he invariably had a bunch of money in his pocket-book. I have been dealing with him about fifteen years, continuously through that period." The record shows that the objections taken were made to this testimony en bloc, on the grounds that it was irrelevant and hearsay, although there are exceptions to particular portions as objectionable, contained in separate grounds of the motion for new trial. The ruling on the objections was directed to the testimony in its entirety. On cross-examination, the defendant elicited from the same witness this testimony: "When I saw him with these bills he had already bought the place he was living on, . . and was living at the other place until the tenant moved away, . . so *Page 692 
he could move in. . . It was before Christmas the last time I saw him with a big amount of money, . . about the middle of the month, I think."
Exceptions are taken to certain charges as submitting to the jury only the issue as to whether the defendant was guilty of murder as charged in the indictment, or was innocent under his contention that he killed the deceased "in defense of his life or of his person against a felonious assault sought to be inflicted upon him by the deceased." Exception is also taken to the failure to charge the law of voluntary manslaughter, on the ground that it was involved under the evidence, and particularly testimony as to admissions made by the accused before the trial, coupled with exculpatory statements. The State contends that even if these statements were such as to raise the issue of voluntary manslaughter, no charge on that subject was necessary, since they were self-serving declarations.
While it appeared from the evidence that the wife of the deceased was killed at the same time and place by pistol shots, the trial was had on the indictment for murder of the husband. On February 2, 1942, both were found shot to death in their country home in Bibb County. The husband's body was found in the kitchen, clothed but without shoes or socks; and shot three times with 38-caliber bullets; once through the right side, the bullet coming out of the left side of the body, and being recovered at the undertaking shop out of his clothing; another shot was in the left shoulder, the bullet being recovered from his right chest under the skin. The third shot was behind the left ear, and the bullet was removed from the right cheek about the center. One of the hip-pockets of the deceased was found partially turned out. The body of the wife of the deceased was found just off of her bed in a bedroom, lying on her side, with both hands up to her face, and with shots through both of her wrists, passing into her body; one bullet being removed from the body near the spine. She was clothed only in a nightgown. All of the drawers in a chifforobe had been pulled out, their contents were in disorder; and some neckties had been thrown upon the prostrate body of the wife. Blood on these contents was hard and dried, and there was blood about and near the body. The doors of the wardrobe part of the chifforobe and of a dresser and sewing machine were standing open, with their contents ransacked or thrown out. *Page 693 
A stipulation signed for the State and for the defendant was in evidence, agreeing that a 38-caliber pistol, which the defendant had identified as belonging to him, together with three 38-caliber bullets, one extracted from the body of the deceased, one from the body of his wife, and one embedded in a sack of sugar in their home, had been sent to the Technical Laboratory of the United States Bureau of Identification in Washington, D.C.; that these articles had been there studied by ballistic experts; and that according to their opinion, all three of the bullets had been fired from that pistol.
O. L. Harris, a deputy sheriff, testified that he arrested the defendant on Tuesday afternoon, after the discovery of the bodies on Monday afternoon, and talked with him Tuesday night; that the defendant "denied it, said he didn't know where [the deceased] lived;" that he was neither threatened nor offered any hope of reward or inducement; that he admitted driving a truck belonging to his employer, M. J. Grace, with whom he lived, to other places in the county; but that he "didn't go to Mr. Perdue's [the deceased]," and "had not been there at all," and that is "all [witness] could get out of him at the first interview." On Wednesday morning, after the defendant's pistol had been found at the house where he lived, the witness showed him the pistol, and the defendant said, "No, it was not his pistol," and that "he didn't know anything about" cartridges also found; but told the witness he was sick with a headache, and would make a statement the next morning. The witness further said that after the defendant had talked with his employer and another person, the defendant "admitted shooting both Mr. and Mrs. Perdue," and dictated a statement to a stenographer, freely and voluntarily without any threat or promise; that the defendant agreed to go to the home of the deceased, and show how it happened, which the defendant did, as follows: "He said he drove out that way and his lights went out, and he showed me where he stopped his truck . . he said he called and Mr. Perdue answered him and told him to come in, and he said he told him he wanted `to stay all night with you, my lights have gone out on my car,' and Mr. Perdue said, `Come in;'" that after smoking some cigarettes, defendant "went back in the kitchen to get water, and he said Mr. Perdue followed along behind him, and he said he didn't remember whether he got the water or not, and he said Mr. Perdue told him, `I am going to kill you, I have got *Page 694 
it in for you,' and he said he had his flashlight and he throwed it in his face and he shot him twice; he said it was a 38 pistol . . and he said he fell towards him, and . . he went out of the kitchen and went back in Mrs. Perdue's room and she said, `You have shot my husband, I am going to kill you,' and she shot at him, so he said;" that "she had a 32 pistol; and I said, `What became of the pistols?' and he said, `I took both of them with me. . . I carried them down there and threw them in the creek.'. . He said Mrs. Perdue shot at him once, and he said Mr. Perdue shot at him twice;" that when they could find no bullet holes from shots, and witness said "That don't look good," the defendant replied "It sho' don't," . . and the next day he changed that statement. "Monday," the witness said, "he told me that [they] didn't shoot at him; he said they had their guns, and he saw they were going to shoot to kill him, and he shot [them] and he took the guns away from them;" that "they didn't shoot at him, and I asked him how many times he shot, and he said five times;" that "Mr. Perdue didn't shoot at him." When the witness "asked him why he threw those pistols away, . . he said, `I don't know how come me to do that . . I wish I had saved them.'"
In the written statement by the defendant, dated February 6, 1942, to which the witness referred, and which was put in evidence, the following appears: "I come back at 1:05 that night. . I got there at the road and my lights went out, and they had told me [Mr. Perdue] moved not very far down the road. He had been a good friend to me, treated me very nice. I went down the road and I looked for the road and I drove up there and hollered and he come to the door and I told him I wanted to stay the rest of the night with him, the lights on my car went out . . and [he] said, `Come on in,' and I went in and I sat there and smoked a couple of cigarettes." The defendant's statement with reference to going to the kitchen was substantially the same as testified by the deputy sheriff, with details as follows: "I went and got a drink of water, and he come in there with a gun and throwed it on me and said, `I am going to kill you' and he said, `I have got it in for you,' and I said, `What have you got it in for me for?' and about that time he shot twice at me, a 38, and I jumped sideways to keep him from hitting me, and I saw I could not get out, he was between me and the door, and I shot him three times, and *Page 695 
I walked on in there in the other room, and started to go out, and his wife, she was up, and she said, `You shot my husband, I will kill you,' and she shot at me once with a 32, and I seen I could not get out, and I shot her twice. There was five shots in all that was all that was shot. I turned and picked both of the guns up, I wish now I had kept them but I didn't do it. I picked them up and went out that door as quick as I could, and I walked down and got in the car and tried the lights and they would not burn, and I drove on down the road that turns, I guess to Seven Bridges. . . These two shots of his and one of hers, the cartridges were in the gun, I never even took them out." The defendant denied opening the drawers that were open at the home of the deceased, because "I didn't go there for any money, I went to stay the rest of the night with them and talk with them." He said that he could not tell why the neckties were on the arms of the wife of the deceased, "never noticed them;" that the homicide occurred about 2 or 2:30 in the morning; that he threw the pistols of the deceased and his wife in a creek; that he hid his own pistol "in the first closet that you come in the door" in an empty room, not his own room, where he lived; that he "stuck that gun up there to keep the kids from getting hold of it." He further said that he did not say anything to anybody about it; "You all [the officers] are the first ones I mentioned it to;" that "Mr. Perdue had a 38," and "his wife . . had a 32;" and that "his 38 was smaller than mine."
The defendant introduced no testimony.
In his statement to the jury, he described his movements in the truck which he drove, during the earlier part of the night of the homicide, and the flickering of his lights "because the battery was not charging so good;" that "the lights would flicker and they would come back on," and "had been flickering for two or three months;" that the lights went out, and he entered the home of the deceased, as the defendant had stated on other occasions; that the deceased told the defendant he wanted defendant to leave his employer and work for the deceased, and when the defendant said, "I can't turn [the employer] down to work for you for the same amount of money," the deceased said, "By God, you are going to work for me," and the defendant said "I can't do it." and the defendant "kind of slipped his chair over, aiming to get up and *Page 696 
run out of the house, and he was sitting like this . . between me and the door with his chair, and he said, `I know one thing, I will just beat your G____ d____ head in the floor, and he jumped up and grabbed his chair and I jumped out of the rocking chair and ran around the chair as he struck at me, and it glanced off and hit the floor, and I ran in the kitchen, and . . he run to the kitchen door and he followed me, and I run to the kitchen door and jerked it, tried to get it open, and it was not half a minute before he run in on me, and I was trying to get out of the door and I whirled around and dipped in the bucket to get a drink of water, I don't know whether I got it or not I was so scared; I think I drank some water, and he come running in on me and said, `G____ d____ you, I have got it in for you, I am going to kill you,' and he throwed his gun in his right hand on me. I don't know whether he shot at me or not, and I shot at him just that way. I happened to have it the gun with me; I just happened to take it out of my car . . He throwed his gun on me to shoot me and . . shot at me and his right side was coming towards me. I was scared, it was done so quick and I was not expecting it, and he kind of turned when I shot; the light was shining on him and he kind of pitched towards me, and I shot him twice more as he fell towards me . . and as his gun fell out, [it] fell to the left side, and I stooped down and picked up his gun and stuck it in my right coat pocket." Defendant further stated that when he ran past Mrs. Perdue, "she said, `You shot my husband and I am going to shoot you,' and she threw her gun on me, and I shot two more shots, and she sunk down;" that he never "took a penny, or touched a thing except the dipper in the kitchen;" that he drove off, and threw the two guns in the creek, one a 38 and the other a 32," after he had "seen two hulls in the 38 and one hull in the 32," and had then said to himself "they shot two shots at me and missed me;" that he later had an accident with the truck, "the wheel was torn off," went to the home of a Mr. Looney, and stayed till daylight, when they fixed the truck, and he drove over to his employer's.
O. L. Harris, the deputy sheriff, recalled after the statement of the defendant, testified as to an additional statement made to him by the defendant: "He said two strangers in a green car overtaken him on the road . . they got out of their car and got in his truck, drove up to the house, taken his pistol, and went in and killed *Page 697 
Mr. and Mrs. Perdue, and come back out and got in the car, gave him his pistol back, and told him he had to go ahead and take the ribbing of killing these people or they would kill him." The witness further testified that the defendant had "made about five statements" to him; and "that was not the first time I had heard him make the statement he made on the stand; he had made it before."
There was additional testimony for the State as to the finding of the defendant's pistol in the loft over a closet in one of the bedrooms at the house of his employer where he lived; that there was nothing wrong with the lighting system of the truck; and that when the defendant pointed out to an automobile mechanic witness as to the wires which were out of adjustment and had to be fixed to make the lighting work, these wires had nothing to do with the lighting system.
(After stating the facts as above.)
1. The verdict of guilty of murder was authorized by the evidence.
2. Where the State, in seeking to show robbery as the motive of a homicide, relies on proof as to the practice of the deceased to carry large sums of money on his person, additional proof of knowledge by the defendant as to this practice is necessary; but such evidence need not be direct, and may be circumstantial by showing an opportunity by the defendant to know of the practice, provided that the practice as thus shown be not too remote in time or place to be relevant to the proved opportunity and the question of motive. Marable v. State, 89 Ga. 425, 426
(15 S.E. 453); Thompson v. State, 166 Ga. 758 (12), 778 (144 S.E. 301); Westberry v. State, 175 Ga. 115 (4) (164 S.E. 905); Sasser v. State, 129 Ga. 541 (4, 5), 547 (59 S.E. 255); Black v. State, 187 Ga. 136, 138 (199 S.E. 810), and cit.; People v. Thompson, 212 N.Y. 249 (106 N.E. 78, 80, L.R.A. 1915D, 236, Ann. Cas. 1915D, 162); State v. Kelly,77 Conn. 266 (58 A. 705).
(a) Even if the testimony as to the habitual carrying by the deceased of large sums of money on his person at a time five years before the homicide and when the defendant apparently was unaware of such practice, since he was not then a resident of the State, was irrelevant, still there is no merit in the exception to the admission of this testimony, since similar evidence was elicited by counsel for the defendant on cross-examination of the same witness, and on the State's examination of another witness without objection. *Page 698 Walthour v. State, 191 Ga. 613 (1, b), 615 (13 S.E.2d 659);Moore v. State, 193 Ga. 877 (2, a) (20 S.E.2d 403);Fluker v. State, 184 Ga. 809 (4), 810 (193 S.E. 749), and cit.; Wheeler v. State, 179 Ga. 287, 288
(175 S.E. 540), and cit.; Whitley v. State, 188 Ga. 177 (3) (3 S.E.2d 588);Cox v. State, 64 Ga. 374 (9) (37 Am. R. 76). Especially is this true, where the court admitted the testimony subject to "a motion to rule it out unless the State connects it up," and where the record shows no such motion. Black v.State, supra, and cit.; Moore v. State, supra.
3. Like objections were made to similar testimony en bloc by another witness as to such a continuous practice during a period of fifteen years before the homicide, but including an occasion only a few weeks previously and a time when the defendant lived in the same house where the deceased then resided. Even though a portion of this testimony might have been irrelevant and inadmissible, since it appears from the evidence that during most of the fifteen-year period the defendant apparently could not have been aware of the practice because of residence in another State, yet there is no merit in the exception to the overruling of objections to the testimony on the grounds stated, since the objections were made to the entire testimony, and part of it was relevant and admissible under the rule above stated. Knight v.State, 143 Ga. 678 (6), 683 (85 S.E. 915); Macon, Dublin Savannah R. Co. v. Anchors, 140 Ga. 531, 536 (79 S.E. 153);Robertson v. Cox, 183 Ga. 744 (4) (189 S.E. 844). Moreover, as to this testimony, counsel for the defendant brought out, on cross-examination of the same witness, almost the same testimony.
4. In a criminal case the general charge to the jury should be so shaped as to present the theories that are involved under the evidence. Accordingly, where there is no evidence involving manslaughter, the fact that such a species of homicide may be involved under the defendant's statement to the jury would not necessitate a charge on that subject, in the absence of a request therefor, provided the judge calls the attention of the jury to the statement and charges the law in regard thereto. Taylor v.State, 131 Ga. 765 (63 S.E. 296); Worthy v. State,192 Ga. 620, 623 (15 S.E.2d 854), and cit.; Shafer v. State,191 Ga. 722 (3) (13 S.E.2d 798). Whether or not the rule requiring a charge on the law of manslaughter if it is involved under the evidence would have application, *Page 699 
where, as here, some of the State's evidence consisted of admissions of the homicide by the defendant, coupled with exculpatory statements in justification, need not be decided, since under all the evidence, including the proof as to such admissions and statements, the defendant was either justified as he contended, or else was guilty of murder, as the court properly submitted to the jury; and the court did not err in failing to charge the law of voluntary manslaughter. Gale v. State,135 Ga. 351 (4), 356 (69 S.E. 537); Coleman v. State,121 Ga. 594 (9), 601 (49 S.E. 716); Crawford v. State,125 Ga. 793 (2), 796 (54 S.E. 695); Brown v. State, 144 Ga. 216,218 (87 S.E. 4); Greer v. State, 124 Ga. 688
(52 S.E. 884); Morgan v. State, 108 Ga. 748 (32 S.E. 854);James v. State, 123 Ga. 548 (51 S.E. 577); Miller v.State, 176 Ga. 825 (2), 829, 830 (169 S.E. 33); 4 Warren on Homicide, 444, 447, § 346, and cit.
Judgment affirmed. All the Justices concur, except Hewlett,J., not participating.