1. The evidence sustains the verdict.
2. The court did not err in charging the law of voluntary manslaughter as applied both to irresistible passion and mutual combat.
3. The court did not abuse its discretion in refusing a new trial on account of newly discovered evidence.
 DECIDED JUNE 3, 1944.
The defendant was tried for murder, and convicted of voluntary manslaughter. He filed an amended motion for a new trial, which was overruled. On this judgment he assigns error. Briefly and substantially the evidence shows: Homer Davis, the deceased, was employed as supervisor on a turpentine place of Mrs. Ola Aultman, in Worth County. The defendant was engaged in a similar business. In July of 1942, Berkley Elvington, a negro turpentine hand, was in the employment of Davis. About that time Elvington left Davis's employment and contracted with the defendant, and moved to the defendant's farm in Crisp County. Elvington was indebted to Davis, and Davis (or Mrs. Aultman) was surety on his appearance bond for some criminal offense. In the latter part of January, 1943, he became dissatisfied with his contract with the defendant. He had also become indebted to the defendant. It appears that the defendant had made some arrangements to assume the suretyship on Elvington's bond. The negro left the defendant's employment and returned to the employment of Davis. He did not pay the account which he owed Davis for Mrs. Aultman when he left Davis to go to the defendant's place; nor did he pay his account with the defendant when he left him. On the morning of January 30, 1943, the defendant went to the town of Warwick in Worth County, where the headquarters of the turpentine firm of Aultman were located, looking for Elvington. He went to Elvington's house but did not locate him, and employed a negro boy to keep a lookout for Elvington and to inform him of Elvington's whereabouts. Elvington, learning that the defendant was looking for him, avoided him. During the day the defendant made several trips to the home of Elvington, located in the quarters owned by Mrs. Aultman. On one occasion, in the afternoon, he had a conversation with Elvington's wife. She testified to the following conversation: "Mr. Williams came to my house that Saturday afternoon about two o'clock. My husband wasn't there. He asked me where was Son — that's what they called him. He asked me where was Son, and I told him I didn't know; and he said he wanted his money, and he said if he didn't get it, he was going to kill him; and he starts off, and then he turned round and come back in my house with a pistol in his hand. He came in my house with a pistol in his hand — he turned around and come back in my house with a pistol in his hand, and he said if he didn't get his *Page 215 
money — if Son didn't get his money he was going to kill him, and he said, `And if you take up for him I will kill you; I will kill you or anyone else that takes up for him.'" She further testified: "I meets Mr. Warren along about the drug store there, and he calls me, and he asks me again had I seen Son, and I told him, `No, I hadn't seen him,' and he said, `Well, you tell him to get my money and bring it to me or I will kill him,' and then he goes on and said that he saw Mr. Homer Davis and Mr. Homer said he couldn't pay him; and he said he was going to kill Son wheresoever he finds him at if it was in Ola Aultman's house — he said wheresoever he finds him at he was going to kill him. That was the last time I saw him. That last time I saw him was `long about Jackson's Drug Store, I was coming' long, and he called me and asked me again where was Son. I told him I didn't know, and he said he wanted his money. and for Son to get it, and he told me he had two pistols and he said, `You want to see them?' And he pulled back his lumberjack and showed them to me, and he said, `I done told Mr. Goff [meaning the sheriff] what I am going to do.'"
In the afternoon of the same day the defendant had a conversation with the deceased concerning the negro hand, Berkley Elvington. A witness who overheard the conversation testified: "Mr. Williams got up and said, `We will have no hard feelings about the nigger — I will go ahead — for the nigger is too sorry to have any fuss or argument about it.' He went away — he went on up towards town. As to whether Mr. Williams said anything about leaving and going home, it probably may have been, but I don't remember everything that was said — they just sat there and talked it over. He told Homer he wouldn't [bother] him — Williams told Davis that he wouldn't bother the nigger. I heard that. Mr. Williams told Homer he wouldn't bother the nigger. That was' long just a little while before sundown — about five o'clock, in the winter time." Another witness testified: "Mr. Davis got his gun out of the truck. I saw Homer Davis get his gun out of the truck, and put it in a scabbard [holster]. I saw him get it. He said he was going down to see if he could find Berkley — the nigger — we all called him Son." Still another witness testified: "I didn't see him then neither, but when I come back from town and comed by the house I heard somebody cussing. Hit wasn't my house, hit was by an old empty house there, and then Mr. Sonny's house was right back up there. I *Page 216 
don't know who it was cussing, but I heard them. I seed Mr. Williams after that. And somebody come out the door and went back in there. As I comes on by I heard cussing and then somebody comed out the door and went back in there. They went back in there. They went back in the house where the fussing was. Hit was about dusk dark. They come out the front door of Son's house. I wasn't fur from the house. I was just over to my house. I had seen Mr. Williams before that, and he offered me a dime to come tell him when Mr. Sonny come." After the defendant and Davis had the conversation as related above, and after they had left the place where the conversation took place, the defendant went towards town, and the deceased, after procuring his pistol, went in the direction of the home of Elvington. Four pistol shots were heard, and when the parties who first arrived at the home of Elvington came on the scene they found Davis lying on his stomach with his left shoulder against the door-facing, inside the house, with the door ajar about five or six inches, and with a pistol clasped in his right hand. The pistol belonged to the defendant. It had been fired one time. The deceased was dead. He had four bullet punctures in his person; two in the front and two in his back. As to these wounds, the undertaker testified: "I remember about the wounds on his body. There was one that went straight through here — well one come straight out here — straight through here. It came out of the back about here, right here — my estimation is it went in there (pointing to left front side) and come out there (indicating left back), and the other one was right here (indicating near top of shoulder). That was on the left side. Yes, it went in there and went on through; it went on in there — on through — and the other wound was just a skin wound, as I remember it. I would say it entered from the back." The doctor testified: "It was only from the holes of the balls that I could tell whether the shots were fired from the back or the front. There was enough evidence to form an opinion as to which way it was fired from — it was fired from the back, there was no doubt about that. From the back — there's no doubt about that. I didn't probe it. I made a measure with a hemostat — just a little instrument, a hemostat — I used that to measure the hole. I just opened it out to the edge of the hole is all. I inserted that instrument in the hole about a quarter of an inch." *Page 217 
Homer Davis's pistol was found in the scabbard [holster] in his hip pocket. The sheriff of Worth County, who arrested the defendant, testified: "He said Homer told him to stay out of the quarters, and told him he wasn't going to the quarters, and he went on down in the quarters; that he wanted to see this negro; and he said when he went in the house Homer stepped from behind the door. That was in the negro house; and he said Homer grabbed him; and he said this pistol that was found in Homer's hand was in his pocket, and Homer grabbed it and went to kicking him and he started falling and Homer shot him; and he said he had another pistol and he grabbed it and went to shooting. He told me he had another pistol on his person, and he shot Homer Davis with it." The evidence was conflicting as to whether the bullets which pierced the body of the deceased entered from the front or the rear of the body. The evidence reveals that one shot was heard, then a short interval, with three other shots following in quick succession. There is evidence of a pistol bullet having entered the building to the right of the door facing, ranging upwards. The defendant in his statement, after having related his relations with Elvington, his conversation with Davis, his purpose for being in Warwick to see Elvington, and his reasons for having two pistols, then gave his version of what happened as follows: "Well, in about thirty minutes after I talked with Homer Davis, Mr. Wright he walked up and told me he saw smoke down at the house where this nigger moved, and so I walked down there and knocked on the door and this nigger woman come to the door, and I asked her where the boy was and she said he wasn't there, that he hadn't come home. And she says, `You can come on in and search for he is not here.' I told him [her], `No, I didn't care anything about searching the house — I just wanted to see the nigger,' and then I turned on back and this same fellow, Wright, would tell you the same thing — if I had thought about it I could have had him make the very same statement, but I never thought about it — but I turned on back and went right on back. After I went on back — I never thought of Homer being mad about that — we stirred around there the balance of that evening waiting on him. Mr. Wright was in a hurry to get back so he could go to town, and so I saw the nigger wasn't stirring around, and I wanted to get through with it that evening and I told him to let's wait and see if I could see him before we left; then, *Page 218 
just before night. I told him to let's go like we were going home and turn around and come back by old Warwick and see if he wouldn't get to stirring — I knew he was there all right. It was beginning to get dark, and as we come on back, we drove up close to the well — as you all know, the well is just opposite the depot — and we set there a good little bit and about dark — it was beginning to get dark — I said, `John, I am going on down there and see if I can see him. We got to go on home, and I am going down here and see if I can see him, but I will come right on back.' So I met this nigger Ocie, at Jackson's Drug Store and I asked her if the nigger had come and she said, `No;' and, while I was there this little nigger boy come up and says, `That nigger is down there in the house now.' And I said, `Where?' And he said, `He's down there in the house now,' and we come on right together, and he asked me about giving him the dime, and I run my hand in my pocket, and I didn't have nothing but a quarter, and I didn't want to give him that, and I told him I would run down there a few minutes and would pay him when I got back. And so I went on down there, and I took this pistol and stuck it right there — I raised the jacket and stuck it right there with the handle sticking out — for I didn't know what the nigger would do. I stuck this pistol — this one here — right in there (indicating in belt), and I stepped right up in the door. I looked both ways and didn't see a soul, and about that time Homer Davis come out from behind the door and says, `I thought you told me you wasn't going in my quarters?" I said, `I did tell you that and I am not going to.' He says, `This is my quarters.' I said, `I beg your pardon, I didn't know that. I thought this was the house the nigger woman rented.' He says, `I believe you knew it was my house.' I says, `No, I didn't.' He says, `I believe you did.' He says, `You know what I believe?' I says, `No,' and he says, `I just believe I ought to beat the God damned hell out of you,' and I says, `Homer, it's not a bit of use of us having trouble about this nigger — ain't no use of us having nigger trouble.' And he went to cussing and says, `Don't put your hand on that gun.' And I says, `I am not putting my hand on the gun. Man, you get quiet — you quiet down here, ain't no use of all this.' He says to me again, `Don't you put your hand on that gun.' I said, `I'm not putting my hand on the gun. You get quiet, and we will talk it over.' About that time, he grabbed the *Page 219 
gun. I didn't try to keep him from getting it — I saw it was no use. I said, `Homer, there ain't no use in this, you get quiet now.' But he cussed right on, and he took hold of me this way — he had me like this, and he was shoving me backwards and forwards and he says, `If you wasn't so God damned old I would beat the God damned hell out of you.' I never opened my mouth, knowing it was not any use, for all the words he said until he threw me out of the door, was cuss words; I knowed it was no use for me to open my mouth, and, as he shoved me out the door, he said, `Get out, you son of a bitch!' And, of course, I got out, and about the time I hit the ground — I might have went to my knees — I mightn't have fell all the way down — I think I went to my knees, but in the twist, he shot me. He had time to shoot me just about two or three times, but I fell kinder out of the light, and I could see him, but he couldn't see just where I was, and as I got straightened out and looked, he had his hand on the door facing like that and he was looking out for me, and had done shoved me out across that light, kinder cater-cornered from the chimney and he couldn't see me, and he was stooping over looking for me, and that give me time to get my other gun, and I done that, and went to shooting as fast as I could for he had shot me with my own gun and I was expecting some more shooting; and, whenever I quit shooting, he was standing there and I looked at him, I reckon a second or two — I was standing in the light and he was standing apparently looking straight at me, and he never had said a word, and I hadn't either, and I turned and walked a step or two, and whenever I walked off about ten feet from the corner of the house — I had not heard a sound — everything was perfectly quiet — I was just wondering if he was coming out and shoot some more — and I stood there I reckon six or eight seconds, and he was still holding to that door, and I heard him fall; and I was bleeding pretty bad, and I decided I better get to the doctor. That is just exactly the way it happened." Concerning the pistol bullet which entered the house, the defendant introduced evidence as to its range.
1. We have given the evidence somewhat in detail, since the questions argued by able counsel by able counsel for both sides do *Page 220 
not differ as to any questions of law involved, but differ as to the application of the facts to the law. The gist of the contentions of the plaintiff in error is (and the argument is in the main directed to that position) that under the evidence voluntary manslaughter was not involved, and that the court committed reversible error in submitting that question to the jury; and that as to the general grounds the evidence does not support the verdict of voluntary manslaughter as applied either to irresistible passion or mutual combat. Counsel for the defendant cite numerous decisions of both the Supreme Court and this court to sustain this position. It is contended that since there was no eyewitness to the homicide, the statements of the defendant made in and out of court are essential to the State's case and that his statement, while admitting the homicide, at the same time contained exculpatory statements which showed justification. In this connection our attention is called, among others, to the following decisions: McBeth v. State,122 Ga. 737 (50 S.E. 931); McCray v. State, 134 Ga. 416
(68 S.E. 62, 20 Ann. Cas. 101); Crawford v. State, 149 Ga. 485
(100 S.E. 633); Miller v. State, 184 Ga. 336
(191 S.E. 115); Roberts v. State, 189 Ga. 36 (5 S.E.2d 340);Irwin v. State, 194 Ga. 690 (22 S.E.2d 499); Wall v.State, 5 Ga. App. 305 (63 S.E. 27). As we view it, the evidence in the instant case is stronger than in the cases cited. When we consider the principle that the jury were authorized to accept a part of the defendant's statement and reject a part (Grimes v. State, 123 Ga. 754, 51 S.E. 721; Cain v.State, 7 Ga. App. 24, 65 S.E. 1069; and Brown v. State,10 Ga. App. 50, 72 S.E. 537), and combine the accepted part with other facts and circumstances as shown by the evidence in this case, a quite different situation is presented from that in the cases cited; and from our view a situation which authorized the submission of voluntary manslaughter to the jury by the court, and which sustained the verdict. A case somewhat similar in principle under facts to the instant case, is Booker v.State, 153 Ga. 117 (111 S.E. 418). See also, Drane v.State, 147 Ga. 212 (93 S.E. 217); Gamble v. State,58 Ga. App. 637 (199 S.E. 662).
It is well settled that if there is the slightest doubt as to whether or not voluntary manslaughter is involved in a particular case, it is the duty of the trial court to submit to the jury such question and let the jury decide what grade is involved.Thomas v. State, *Page 221 51 Ga. App. 455 (2) (180 S.E. 760). The jury were authorized to infer from human experience and observation of human conduct that both the deceased and the accused mutually intended to fight to the death with deadly weapons. In reaching this conclusion they were not confined to the statements of the defendant in and out of court. The attitude of the defendant and of the deceased, as disclosed by the evidence, including the defendant's statement, authorizes this view. Also, the question of voluntary manslaughter under a passion was authorized. If, when the deceased and the defendant met at the scene of the homicide, the deceased took one of the defendant's pistols and in a scuffle, or deliberately, inflicted a wound on the defendant, as the defendant contends, and turned away and the defendant shot the deceased in the back, as the evidence shows, the jury were authorized to find voluntary manslaughter under an irresistible passion.
2. The first four special grounds complain in several ways of the court's charge on voluntary manslaughter. It is nowhere contended that the principles of law given in charge are erroneous in the abstract. The only assignment of error is that the facts did not warrant a charge on voluntary manslaughter. We have dealt with these questions along with the general grounds.
3. Special ground 5 is based on newly discovered evidence. The State made a counter-showing. The judge became the trior of this issue and resolved it against the accused. In doing so we think no abuse of discretion was shown. The court did not err in overruling the motion for new trial for any of the reasons assigned.
Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.