STATE, Respondent, *v.* COLLINS, Appellant.

(No. 6,713.)

(Submitted November 8, 1930.  Decided December 13, 1930.)

[294 Pac. 957.]

*Mr. Paul Babcock* and *Mr. T. W. Greer,* for Appellant, submitted a brief; *Mr. Babcock* argued the cause orally.

518

*Mr. L. A. Foot,* Attorney General, and *Mr. T. H. MacDonald,* Assistant Attorney General, for the State, submitted a brief; *Mr. MacDonald* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Defendant and one Fishbeck were accused by information "of the crime of assault with intent to commit a felony," in that on or about January 11, 1930, they "did wilfully, unlawfully and feloniously assault one Dolores Pickett, a female person under the age of eighteen years, to-wit: of the age of sixteen years, and not the wife of either of said defendants, by forcibly and violently seizing the said Dolores Pickett, and

forcing her into a bedroom and violently pushing her over and upon a bed, in and upon the premises of the defendant, S. R. Collins, also known as 'Nig' Collins, near Plentywood, Montana, in said county and state, against her will and without her consent, and then and there did struggle with her, the said Dolores Pickett, with the intent in them, the said defendants, to then and there commit a felony upon the person of the said Dolores Pickett, and to have sexual intercourse with her and to rape the said Dolores Pickett; the said defendants, S. R. Collins, otherwise known as 'Nig' Collins, and the said Frank J. Fishbeck, each being a male person over the age of twenty-one years.''

1. The accused was arraigned upon February 28, and pleaded not guilty. On March 3, without objection, the cause was assigned for trial upon March 25, but upon March 12 the accused filed a motion for a continuance upon the ground that a large proportion of the persons qualified for jury duty in the county were affected by bias and prejudice on the merits of the case, and therefore it would be impossible to select a fair and impartial jury for the trial. The motion was supported by many affidavits and the state filed many affidavits denying the material parts of the affidavits filed by the accused. After consideration the court denied the motion. This is assigned as error, but we cannot see any abuse of discretion, and unless it is shown that the court abused its discretion in granting or denying the postponement of a trial, the order will be affirmed. (See sec. 11937, Rev. Codes 1921; *Ward* v. *Strowd,* 76 Mont. 93, 244 Pac. 1007; *State* v. *Howard,* 30 Mont. 518, 77 Pac. 50; *State* v. *Showen,* 60 Mont. 474, 199 Pac. 917.)

When the case was called for trial, the defendants, in response to the court's inquiry, said they were ready for trial, but demanded separate trials. The state thereupon elected to try defendant Collins first. A jury was impaneled, apparently without difficulty, and the trial proceeded. The jury found defendant Collins, who will be referred to hereafter simply as the defendant, guilty of assault in the second de-

gree, and the court rendered judgment against him. He moved for a new trial, which was denied. He then appealed from the judgment and from the order denying him a new trial.

2. The transcript tells a sordid story. It appears that defendant owned a place about a mile and a quarter from Plentywood, known as Nig Collins' chicken ranch. The residence upon the place is divided into a small dance-hall, four bedrooms, a dining-room and a kitchen. It had borne the reputation of being a house of prostitution but no one was living there at the time of the alleged crime but defendant himself. Although defendant, forty-four years of age, had lived at the house during 1929, he did not deny that prostitution was carried on there during that year. The most he would say was that he could not swear whether it had been practiced there or not.

From the testimony of the state's witnesses it appears that on January 9, 1930, three high-school girls, Dolores Pickett, sixteen years of age, Eugenie Garneau, two days past eighteen, and Lucille Wright, seventeen, were at a table in a cafe in Plentywood. Frank J. Fishbeck, a married man, thirty-six years of age, came to the table where the girls were seated and engaged in a whispered conversation with Dolores. He whispered, "Do you want to go on a party?" She said she did not know, "Who is going along?" He said, "Nig Collins. Get your friend Genie. * * * We might go out to Nig's place." Dolores said she did not know, she would talk to Genie about it, but she did not think they would go unless all went along, meaning to include Lucille. Fishbeck said he would get Stanley Palubicki for Lucille. Dolores said she would see about it. The party was to be on Saturday night. After Fishbeck went away, she talked in whispers with the other girls about the party, but it seems they did not come to any definite conclusion. On Saturday evening the girls met. Doubtless all were inclined to accept Fishbeck's invitation, but they had not decided to go to the chicken ranch. They walked about the streets a bit, eventually passing Kavon's

Garage which was run by Fishbeck and Palubicki, and as they did the three men came out; it was about 8:30 in the evening. Fishbeck said, "Do you want to go on that party?" and, receiving an affirmative answer, he told them to go down by the Farmer-Labor Temple and they, the men, would meet them there. The girls went to the place appointed and found the car in which they were to go in the alley behind the temple. Defendant was driving. The girls protested mildly against going to the chicken ranch, but upon being told no one else would be there, tacitly gave their consent to having the party there. They knew the excursion was not free from peril; when the car stopped they hung back, permitting the men to precede them into the house, and agreed if any one of them should be attacked, "we'll all stick together," and this the sequel shows they attempted to do. The house was warm, ready for their reception.

In the dining-room there were a radio, buffet, table and chairs. They turned on the radio and for a time played cards and checkers or danced. After they had been there about fifteen minutes, Fishbeck said it was about time they had some drinks, and defendant said he would get them, which he did. The drinks consisted mainly of whisky. Three rounds of drinks were served. After the first drink, defendant kissed Dolores and Fishbeck kissed Eugenie. It was not long before there was conversation of a salacious character. While defendant was playing checkers with Lucille he suggested sexual intercourse to her. Nothing came of this. Fishbeck proposed to Genie in the hearing of all that the two go into a bedroom and have sexual intercourse, and afterwards made the same proposal to Lucille; both girls refused. Shortly after that, defendant and Dolores went into the kitchen to get something to eat, and while there defendant said to Dolores, "Let's go into the bedroom," and when she said, "No," he grabbed her wrists and against her angry protests pulled her into a little hallway and thence into a bedroom which was dark; there was no light there. He pushed her upon a bed, and when she tried to get up got on the

bed with her and threw his left leg over her legs. She said defendant "would pull my dress up and I grabbed his hand. I was lying on the bed on my back and my feet were hanging over the bed. His right arm was around me and his left hand was loose. * * * When he pushed me on the bed, I hollered for Genie and then a few minutes after that I hollered for her again. I was on the bed about ten minutes and all that time I was trying to get up and couldn't because he had one leg over me. He had his leg over me, just over my legs. During that time I was fighting; fought for ten minutes." She kept asking him to let her up and he would not do it; she spoke loudly and in anger. The others were in the dining-room, "but the radio was going and you couldn't hear what they said." Her clothing was not disarranged except that her skirts were lifted above her knees—the skirts were raised five or six inches or possibly a foot above the knees. The bedroom door was not closed. Finally, Dolores said, she heard Genie crying and told defendant there was something wrong in the other room and to let her up. He then released her.

In the meantime Fishbeck had again asked Genie to go into the bedroom and she again refused. He then said, "I will take you in there then," and started toward the bedroom, but Lucille got up and stood in front of the door, and he said to Lucille, "I will take you in there then," and attempted to do so, but Eugenie then stood in front of the door. Despite the seriousness of the subject these three seem to have maintained good humor. But when Eugenie heard Dolores call "Genie!" and started for the door Fishbeck's humor seemed to change. Eugenie got as far as the hallway when Fishbeck intercepted her, pulled her back into the dining-room and pushed her into a chair; she kicked him and arose to her feet; he hit her in the face and knocked her back on to the chair. She then hit him on the head with a glass which caused the blood to flow and he hit her violently on the nose, upon which she cried out. It was a refined party!

Palubicki, it seems, took no active part in any of these affairs. He simply desisted from interfering. After the defendant and Dolores returned to the dining-room and the blood was washed from Fishbeck's head and Genie's nose, all returned to Plentywood.

2. It is argued that, granting defendant did as Dolores says ▮ he did, he is not guilty of an assault with intent to rape, and the court should have granted defendant's motion for a directed verdict. Incidentally, the court could have done no ▮ more than to advise the jury to acquit. (Sec. 11995, Rev. Codes 1921.) The court did not err in its ruling. With what intent did defendant seize this sixteen year old girl by the wrist, drag her through an unlighted hallway into a bedroom shrouded in darkness, throw her upon the bed, forcibly retain her there, raise her skirt, and hold her prone upon her back while she fought with him for ten minutes? For what purpose was he struggling with her? What was he about in that dark room? Was he reciting the psalms to her, praying with her, chiding her for drinking whisky in a house of ill repute? On the contrary, the circumstances can leave no doubt in the mind of anyone but a simpleton that her consent given— consent which the law did not permit her to give—he would have debauched her. Plainly enough he intended to do so. The sole extenuating circumstance in his favor is that he did not take by force that which otherwise was denied him. He assaulted her by laying violent hands upon her, by throwing her upon the bed, by throwing his body upon her, by his other acts when he had her in her disgraceful position. His intent being plain, the crime charged is proven. (*People* v. *Porter,* 48 Cal. App. 237, 191 Pac. 951; *People* v. *Moore,* 155 Cal. 237, 100 Pac. 688; *Dickens* v. *People,* 60 Colo. 141, 152 Pac. 909; *Lee* v. *State,* 7 Okl. Crim. 141, 122 Pac. 1111.)

The rule laid down in *State* v. *Hennessy,* 73 Mont. 20, 234 Pac. 1094, does not apply in cases of assault with intent to rape when prosecutrix is under the age of consent.

3. Dolores was asked if she knew what the defendant was ▮▮ trying to do when he had her upon the bed, and she

said, "Yes." Then the question was put, "What was he trying to do?" Counsel for defendant objected: "No foundation laid for the question, calling for a conclusion of the witness at the present time." The court having overruled the objection, the witness said, "He was trying to have sexual intercourse with me." Counsel then moved to strike the answer as a "conclusion of the witness and no foundation laid," which was overruled. Error is assigned. It is true that the witness was allowed to state her conclusion. How she could have come to a different conclusion it is difficult to conjecture. To say that this girl, under the circumstances, did not know exactly what defendant's actions meant is to cast doubt upon her intelligence, and there is no hint in the record that she was not intelligent. "A man's intentions may be manifested by his words or his actions, and, when known, may be sworn to with as much certainty as any other fact. When a witness undertakes to swear to a thing of that kind, the jury who hear the oath will value it at what it is worth." (*Delancy* v. *Little*, 4 Serg. & R. (Pa.) 503, quoted in 1 Wigmore on Evidence, 2d ed., p. 1066.) The difficulty in attempting to distinguish between "opinion" on the one hand, and "fact" or "knowledge" on the other, in the multitudinous affairs of every-day life, is discussed by Dean Wigmore in section 1919 of the second edition of his work on Evidence; and see sections 1928 and 1929.

However well justified may be the criticisms of the "Opinion" rule, the general rule in this country is that a witness may state facts and not his opinions or conclusions, but there are exceptions to this rule as well settled as is the rule itself. "An ordinary witness may be permitted to testify to his opinion or conclusion where the facts as they appeared to him at the time cannot clearly and adequately be reproduced, described and detailed to the jury." (16 C. J. 747.) Or, as was said by this court in *State* v. *Lucey*, 24 Mont. 295, 61 Pac. 994, 997, a witness "may be permitted to state his conclusion upon matters with which he is especially acquainted, but which cannot be specifically described," citing section 460

of Wharton's Criminal Evidence. When the evidence speaks upon such matters of common observation and experience as that the jurors are just as competent to draw inferences therefrom as the witness, there is no necessity for receiving the opinion of the witness thereon. "When the opinion of a non-expert witness is received, the facts and circumstances upon which he bases his opinion or conclusion should be stated as far as is practicable, in order that the jury may have some basis to test the value of his opinion." (16 C. J. 748.) In determining whether the conclusions or opinions of either an ordinary or an expert witness are admissible the court must exercise a large measure of discretion. "In determining what is a statement of fact, as distinguished from an opinion or a conclusion, the courts sometimes disregard"—and should disregard—"distinctions which are more metaphysical than substantial and hold admissible a statement although it may fall under the head of opinions or conclusions and represents such a simple and rudimentary inference as to be practically a statement of fact. The immediate conclusions of a witness drawn from what he saw and heard are not rejected as opinion evidence." (16 C. J. 749.)

While it is true that the question and answer under consideration were perhaps unnecessary for the reason that the jury without the answer had enough before it to determine the fact issue correctly, the answer, based as it was upon the witness' prior testimony, was a compound of fact and conclusion—a "shorthand rendering of the facts" as they were observed and experienced by her, and it was not error to receive it. (*State* v. *Lucey,* supra.) It must be clear to everyone that, even if the witness had possessed an unusual faculty of transmitting knowledge by language, facial expression and gesture, it was impossible for her to portray to the jury with keen accuracy the actions of the defendant, the surrounding conditions considered.

4. Numerous errors are assigned on the ground that the court permitted evidence of acts and declarations of Fishbeck ▮▮▮ out of the presence and hearing of defendant. As a

general rule a defendant cannot be bound by acts and conversations between third persons not in his presence, although under some circumstances such may be admissible as part of the *res gestae.* (33 Cyc. 1460; *State* v. *Grove,* 61 W. Va. 697, 57 S. E. 296.) And evidence of the acts and declarations of a co-conspirator done and made in furthering a conspiracy, then pending, whether in the presence or with the knowledge of the other parties to the conspiracy or not, are admissible against all. (*State* v. *DeWolfe,* 29 Mont. 415, 74 Pac. 1084; *State* v. *Hopkins,* 68 Mont. 504, 219 Pac. 1106.) We need not stop to consider whether some of this evidence was admissible as part of the *res gestae;* all of it was, under the conspiracy rule.

The state's evidence warrants the conclusion that Fishbeck and defendant were acting in concert from the start, and that their purpose was to take Dolores and Eugenie to the chicken ranch for sexual intercourse. It is fairly inferable, in view of the surrounding circumstances and what followed directly, that the two men had this project in mind when Fishbeck, in whispers, suggested the "party" to Dolores—"bring your friend Genie." From that time on every act of defendant and Fishbeck denotes concerted action with a common intent. The actions of the two after arrival at the house of malodorous repute, and before defendant began his assault on Dolores, are highly significant, and the act of Fishbeck in preventing Eugenie from going to Dolores' relief is of especial importance. In *Brown* v. *State,* (Okl. Crim.) 273 Pac. 1018, the defendant, although knowing that one Sledge was attempting to rape a girl, who was screaming, not only refused to go to her relief, but prevented his companion, a Miss Morrison, from doing so. The facts surrounding the transaction convinced the court that defendant kept Miss Morrison away from the scene of the crime in order to give Sledge, the raper, an opportunity to commit the crime; consequently defendant was held to be a co-conspirator and a verdict of guilty was upheld. (And see *Elliott* v. *State,* (Okl. Crim.) 281 Pac. 305.) A somewhat similar case is *Gibson* v. *State,* (Okl. Crim.) 283

Pac. 790, 794, wherein the court in sustaining the conviction of defendant, charged jointly with others with the crime of assault with intent to rape, said: "All of the facts and circumstances indicate the defendant was assisting in getting the prosecuting witness out in the country, and was present on all occasions when she was driven out the road, and that he did everything he could to give Ridenhour, Pollett and Furnish an opportunity to commit the crime that was attempted on the prosecuting witness." (And see *State* v. *Sykes,* 191 Mo. 62, 89 S. W. 851.)

When two men agree to do an unlawful thing and either commits an overt act in furtherance of the agreement then pending, both are responsible for the act and its necessary consequences. They are conspirators. A conspiracy may be proved by circumstantial evidence. "It is not necessary to prove by direct evidence an agreement to commit a crime in order to establish a conspiracy." (*State* v. *Delbono,* 306 Mo. 553, 268 S. W. 60, 63; *Skillian* v. *Commonwealth,* 206 Ky. 586, 268 S. W. 299.)

5. It is argued that the court erred in permitting counsel ▮ for the state, over objection, to inquire of defendant, on cross-examination, whether the house to which he took the girls "for a large part of the year past" had been conducted as a house of prostitution (to which defendant's answer was not to his credit), and to ask Fishbeck, on cross-examination, whether he knew the reputation of the house, and, that question being answered in the affirmative, what that reputation was. Fishbeck answered, in effect, that the place had the reputation of being a house of prostitution. These inquiries, and others respecting the reputation of the house, were proper as tending to show the intention of defendant and Fishbeck in taking the girls there. The materiality of the testimony is too plain for argument. (Compare *State* v. *Gunn,* 85 Mont. 553, 281 Pac. 757.)

6. The court instructed the jury that it might find either ▮ one of two verdicts: (1) guilty of assault in the second degree; (2) not guilty. This instruction was objected to

"for the reason that such offense is not charged in the information in this case, the information charging the defendant with assault with intent to commit rape. The defendant contends that the jury must either find from the evidence, beyond a reasonable doubt, that the assault, if any is shown or proven, was committed with intent to commit rape or that they must find the defendant not guilty."

Section 10977, Revised Codes 1921, contains five subdivisions, the fifth of which provides in effect that every person who assaults another, under circumstances not amounting to assault in the first degree, with intent to commit a felony, is guilty of an assault in the second degree.

The information does charge defendant with committing an assault with intent to commit rape, as counsel say; but it also charges assault in the second degree; rape is a felony, and an assault with intent to commit rape is, of course, an assault in the second degree.

The state of Washington has statutes defining assault similar to ours, and in *State* v. *Steele*, 83 Wash. 470, 145 Pac. 581, a similar argument was advanced. The court said that which is apt here: "That the information was sufficient to charge an assault in the second degree is a question hardly open to debate."

7. Other assignments of error have been carefully considered. Each of them is of lesser merit than those we have considered. The instructions given were as favorable as defendant could reasonably ask. Throughout the trial the presiding judge was fair and impartial, guarding the defendant's rights at all times.

The judgment and order are affirmed.

Associate Justices Matthews, Galen, Ford and Angstman concur.