No. 13253

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

THE STATE OF MONTANA,

        Plaintiff and Respondent,

-vs-

BERNARD JAMES FITZPATRICK,
GARY RADI, TRAVIS HOLLIDAY,
PAUL BAD HORSE, JR., and
EDWIN R. BUSHMAN,

        Defendants and Appellants.

---

Appeal from:  District Court of the Thirteenth Judicial
          District,
          Honorable Nat Allen, Judge presiding.

Counsel of Record:

  For Appellants:

      John L. Adams, Jr. argued, Billings, Montana
      Robert L. Stephens, Jr. argued, Billings, Montana
      Reno and Dove, Billings, Montana
      James Reno argued, Billings, Montana
      Chris J. Nelson argued, Billings, Montana
      Clarence T. Belue, Hardin, Montana
      Cate, Lynaugh, Fitzgerald & Huss, Billings, Montana

  For Respondent:

      Hon. Michael Greely argued, Attorney General,
       Helena, Montana
      James Seykora argued, County Attorney, Hardin,
       Montana
      James Sinclair argued, Special Deputy Co. Attorney,
       Billings, Montana

---

                Submitted:  January 28, 1977

                  Decided:  JUL 29 1977

Filed:  JUL 29 1977

*Thomas J. Kearney*
             Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an appeal from the final judgment of the district court, Big Horn County, following a jury trial. Defendants Fitzpatrick and Radi appeal from judgments of conviction for deliberate homicide, aggravated kidnapping and robbery. Defendants Holliday and Bad Horse appeal from judgments of conviction for robbery.

On May 20, 1975, the State of Montana filed an Information charging defendants Fitzpatrick, Radi, Holliday, Bad Horse and Bushman with deliberate homicide, in violation of section 94-5-102(1)(a)(b), R.C.M. 1947; aggravated kidnapping in violation of sections 94-5-303(1)(b)(c), 94-5-303(2) and 94-5-304, R.C.M. 1947; and robbery, in violation of section 94-5-401(1)(b), R.C.M. 1947. The affidavit of probable cause indicates these charges stem from the April 5, 1975 robbery of the Safeway store in Hardin, Montana and the murder of Monte Dyckman, a Safeway store employee. Following defense motions for severance of trial, change of venue and disqualification of judges, trial was held in Billings, Montana in October 1975. Defendant Bushman testified in behalf of the state and was granted immunity from prosecution. At the conclusion of the state's case-in-chief, all defendants rested without offering evidence. Defendants Fitzpatrick and Radi were found guilty of deliberate homicide, aggravated kidnapping, and robbery. Defendants Holliday and Bad Horse were found guilty only of robbery.

On October 29, 1975, defendants Fitzpatrick and Radi were each sentenced to 100 years imprisonment for the crime of deliberate homicide; 100 years imprisonment for the crime of robbery as persistent felony offenders pursuant to section 95-2206.5, R.C.M. 1947; and death by hanging for the crime of aggravated kidnapping. Defendants Holliday and Bad Horse were each sentenced to 40

- 2 -

years imprisonment for the crime of robbery. Defendants Radi and Fitzpatrick's sentences of death were stayed by the district court pending appeal to this Court.

At trial the state offered evidence to prove that defendants met in Billings, Montana on April 5, 1975 and conspired to rob the Safeway grocery store in Hardin, a small community 50 miles south of Billings. The state offered direct and circumstantial evidence tending to prove that on the evening of April 5, 1975 defendants Fitzpatrick and Radi drove to Hardin in Radi's automobile, while Holliday, Bad Horse and Bushman together drove to Hardin in another automobile. Defendants parked in front of the Safeway store and waited until closing time when Everett Stoltz, the store manager, and Monte Dyckman, a store employee locked the store doors and drove away in different automobiles. Fitzpatrick and Radi followed the store manager. The remaining defendants purportedly followed Monte Dyckman but lost sight of him when he stopped at the post office to deposit mail. When the store manager drove to his home, Radi and Fitzpatrick realized the store receipts were carried by Dyckman and they proceeded to the bank where the deposit was to be dropped. It is alleged Fitzpatrick and Radi abducted Monte Dyckman at the bank, prior to his depositing the store's receipts, robbed him, and then killed him in the vicinity of the Toluca Interchange, 12 miles west of Hardin, within the boundaries of Big Horn County.

Defendants raise numerous issues on appeal. We hold the judgments of conviction must be reversed and the causes remanded for new trials. Therefore, we discuss only the following issues to insure that we do not comment on matters to come before the district court in a new trial:

I. Whether the Montana statutory provisions for jury selection are constitutionally valid and, if so, whether the jury

in the instant case was selected and drawn in substantial compliance with the law?

II.  Whether the defendants were prejudiced by the joinder of their trials?

III.  Whether there was sufficient corroboration of defendant Bushman's testimony?

IV.  Whether the convictions of defendants Holliday and Bad Horse should be reversed and the charges against them dismissed on the grounds the jury was inadequately instructed on the applicable law and returned inconsistent verdicts?

Issue I.  Defendants initially contend their convictions should be reversed and the causes remanded on the grounds the Montana statutory provision for selecting jurors is unconstitutional and, even if the statute is found to be constitutional, that the jury panels in the instant case were selected and drawn in total disregard of the applicable Montana law.  Section 95-1908, R.C.M. 1947, sets forth the procedure in challenging the selection of a jury panel:

> "Motion to discharge jury panel.  (a) Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel.  The motion shall be made at least five (5) days prior to the term for which the jury is drawn.  For good cause shown, the court may entertain the motion at any time thereafter.
>
> "(b)  The motion shall be in writing supported by affidavit and shall state facts which show that the jury panel was improperly selected or drawn.
>
> "(c)  If the motion states facts which show that the jury panel has been improperly selected or drawn, it shall be the duty of the court to conduct a hearing.  The burden of proof shall be on the movant.
>
> "(d)  If the court finds that the jury panel was improperly selected or drawn, the court shall order the jury panel discharged and the selection or drawing of a new panel in the manner provided by law."

At the outset we note defendants have failed to comply with section 95-1908.  Defendants raised the issue of improper

jury selection and drawing in a timely and specific manner, but the district court record fails to disclose the submission of any affidavit in support of the allegation. Defense counsel contend, on oral argument before this Court, that the timely submission of a supporting affidavit, required by section 95-1908, was prohibitive since counsel lacked the means of determining the manner in which the jury panel was selected and drawn. Absent such knowledge, defense counsel conclude the filing of affidavits before this Court at the time of appeal is sufficient. We disagree.

The district court file clearly reveals that at least one defense counsel was cognizant of the provisions of section 95-1908. The motion of defendant Bad Horse to discharge the jury panel states:

> "COMES NOW the Defendant, PAUL BAD HORSE, JR., and moves the Court to Discharge the Jury Panel herein pursuant to Section 95-1908, R.C.M. 1947.
>
> "Said motion will be supported by affidavit when the jury panel is selected and made known to this defendant.
>
> "Dated this 29th day of August, 1975."

The district court file is deplete of any affidavit supporting this motion to discharge the jury panel. Absent such a showing of good cause to substantiate their motion, defendants cannot challenge the jury panel for the first time on appeal on the ground that the district court failed to select and draw jury panels in accordance with applicable Montana law. Ledger v. McKenzie, 107 Mont. 335, 85 P.2d 352; State v. Corliss, 150 Mont. 40, 430 P.2d 632. The means of establishing good cause, specifically the sworn affidavits of the chief deputy clerk of the district court of Yellowstone County and the Yellowstone county registrar of voters, were as accessible at the time of trial as at the time of appeal.

Yet, defendants' failure to comply with section 95-1908, will not foreclose our consideration of whether the jury panel

was properly selected and drawn where the fundamental constitutional rights of the defendants are at stake. State v. Porter, 125 Mont. 503, 242 P.2d 984; State ex rel. Henningsen v. District Court, 136 Mont. 354, 348 P.2d 143; State v. Chapman, 139 Mont. 98, 360 P.2d 703. Thus we consider the question of whether the selection of jurors and drawing of jury panels in the instant case infringed on defendants' fundamental constitutional rights?

This Court has long held the accused in a criminal prosecution is constitutionally guaranteed a trial by an impartial jury selected and drawn in accordance with the law. State ex rel. Henningson v. District Court, supra; State v. Hay, 120 Mont. 573, 194 P.2d 232; Dupont v. McAdow, 6 Mont. 226, 9 P. 925. Any material deviation or departure in procuring a jury has been held to constitute a denial of fundamental constitutional rights. State v. Porter, supra; State v. Groom, 49 Mont. 354, 141 P. 858; State v. Tighe, 27 Mont. 327, 71 P. 3; reversed on other grounds 35 Mont. 512, 90 P. 981.

The Revised Codes of Montana are explicitly clear in defining the procedure to be followed in selecting jurors and drawing jury panels. Section 93-1301, R.C.M. 1947, provides that registered electors whose names appear on the most recent list of all registered electors, as prepared by the county registrar, are competent to serve as jurors. Section 93-1401, R.C.M. 1947, provides that a list of persons to serve as jurors must be prepared by the chairman of the county commissioners, or in his absence, any member of the board of county commissioners, the county treasurer and the county assessor or any two of such officers. Once the jury list is composed, section 93-1402, R.C.M. 1947, requires that each name on the list be assigned a number and the list of the names of the persons be delivered by those officers to the clerk of the district court pursuant to

section 93-1403, R.C.M. 1947. Section 93-1404, R.C.M. 1947, mandates that the clerk of court place the individual pieces of paper, embossed with the number assigned each juror, in a box and from this box the numbers are to be drawn by the district judge in the presence of the clerk of court pursuant to section 93-1502, R.C.M. 1947. Section 93-1512, R.C.M. 1947, provides that in the event additional jurors are needed, their numbers must also be drawn by the district judge.

Defendants contend section 93-1301, regarding the competency of jurors, is unconstitutional in that voter registration lists fail to provide a true cross-section of the community in violation of equal protection requirements of the state and federal constitutions. It is argued the voter registration system excludes residents who are qualified for jury service, but are not qualified to vote or do not choose to vote. The issue of whether voter registration lists are a proper instrument for selecting jurors was recently discussed in United States v. Ramos Colon, 415 F.Supp. 459, 464:

> "From a constitutional standpoint it is well settled that voting lists may be used as a basis for jury selection unless it appears that in the community there is systematic, intentional and deliberate exclusion from those lists of a particular economic, social, religious, racial, geographical or political group. [Citing cases.]

From Colon and Foster v. Sparks, 506 F.2d 805, we glean the prima facie case for establishing a statutory challenge to a jury selection system on the ground of jury composition: 1) Proof that the jury selection system is disadvantageous to a cognizable class, and 2) proof that the disadvantage is occasioned by discrimination in the selection process.

Defendants bear the burden of establishing the cognizable class which is discriminated against by the jury selection process. Purposeful discrimination may not be assumed or merely asserted.

Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L ed 2d 759; Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L ed 84. Defendants' only allegation of discrimination was that the jury panel was composed of all whites, with the exception of two Indians, and that the convicting jury was exclusively white in composition. Such allegation falls short of establishing a prima facie case challenging the jury selection system on the ground of racial composition. Petition of Boe, 156 Mont. 303, 481 P.2d 45; State v. Johnson, 149 Mont. 173, 424 P.2d 728. It is a well accepted proposition of law that the voter registration list, from which the jurors are selected, and the jury panel need not perfectly mirror the racial composition of the community. Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L ed 2d 690; Foster v. Sparks, supra; State v. Taylor, 168 Mont. 142, 542 P.2d 100, 32 St.Rep. 993.

Defendants further contend the jury panels in the instant case were selected and drawn in total disregard of the applicable Montana law. We find merit in defendants' claim that the manner in which jurors were selected and drawn substantially deviated from the procedures mandated in Title 93, Revised Codes of Montana, 1947. Specifically, all duties delegated to the jury commission and district court judge were performed by the clerk of court without any apparent overseeing. While we have no cause to question the good faith of the public officers involved, it is obvious the statutory scheme for selecting and drawing a jury was completely circumvented. The rule in Montana is that juries must be selected and drawn in substantial compliance with the law. Where the disregard for legislative mandates amounts to more than technical irregularity substantial compliance has not been achieved. State ex rel. Henningsen v. District Court, supra; State v. Porter, supra. We stated initially that this

matter was not properly raised on appeal, but it is of sufficient import to warrant a full discussion for future guidance.

Issue II. Defendants contend that the joinder of their trials, after timely and specific filing of motions for severance, brought about these errors:

1. The jury was allowed to consider hearsay evidence which was inadmissible against certain defendants, yet admissible against others.

2. The admission of hearsay evidence denied individual defendants their fundamental constitutional right to confrontation under the Sixth Amendment of the United States Constitution.

3. The joinder of defendants' trials denied defendants their right to effective assistance of counsel.

The only specific example of the admission of extrajudicial hearsay cited to us is Bushman's testimony of statements allegedly made by defendant Radi. Bushman testified these statements were made at Radi's home in Billings on April 6, 1975, at approximately 2:30 a.m., several hours after the commission of the alleged crimes. All of defendants, with the exception of Fitzpatrick, were present when the statements were made. Bushman testified Radi stated:

"A. 'Fitz didn't have to shoot the kid.'

" * * *

"A. And he said, 'Fitz shot him.' He said, 'Boom, boom, he blew his head off.'

" * * *

"A. * * * he said, 'Fitzpatrick is pretty pissed off.' he said, 'He is uptown getting drunk because him having to shoot the kid for nothing because there was no money in the bag.'"

The court's Instruction No. 1, stated:

"You are instructed that where one defendant

testifies about what was said by a second de-
fendant, it is ordinarily not admissible as
evidence against any other defendant if that
other defendant was not present at the time and
place where it was said.

"However, what is said is admissible against the
defendants that are present when it is said.

"In your deliberation, you are not to consider
what was said against any defendant who was not
present at the time and place where it was said.

"You may consider what was said as evidence against
those defendants present at the time and place it
was said.

"The reason for this is that a defendant who is
not present when something was said about him,
cannot, of course, deny that it was said because
it is quite obvious he was not there to know the
facts. Therefore, you will not use it as evidence
against him."

Defendants contend the instruction of the district court

was insufficient and failed to erase from the minds of the jurors

the crucial and devastating prejudice naturally flowing from the

testimony.

In support of their argument defendants cite Bruton v.

United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L ed 2d 476.   In

Bruton the codefendants Bruton and Evans were tried jointly and

convicted of armed postal robbery.   During the trial a postal

inspector testified Evans confessed that Bruton and Evans com-

mitted the robbery.   Evans' conviction was later reversed be-

cause the oral admission had been elicited by police officers

in disregard of Evans' Miranda rights.   Bruton's conviction was

upheld on the theory the trial court sufficiently instructed

the jurors not to consider Evans' confession as evidence against

Bruton.   The United States Supreme Court disagreed and reversed

Bruton's conviction stating:

" * * * because of the substantial risk that the
jury, despite instructions to the contrary, looked
to the incriminating extrajudicial statements in
determining petitioner's guilt, admission of Evans'
confession in this joint trial violated petitioner's

- 10 -

right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." 391 U.S. 126.

In a footnote the Court said:

"We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence  * * * the problem arising only because the statement was * * * admissible against the declarant Evans. * * * There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause."  391 U.S. 128.

The state argues <u>Bruton</u> is distinguishable from the instant case since the hearsay statements testified to by Bushman were admissible under the  coconspirator exception to the hearsay rule.  Section 93-401-27, R.C.M. 1947, provides in part:

"<u>Facts which may be proved on trial</u>.  In conformity with the preceding provisions, evidence may be given upon a trial of the following facts:

" * * *

"6.  After proof of a conspiracy, the act or declaration of a conspirator against his coconspirator, and relating to the conspiracy."

The state further argues even if Radi's declarations were not admissible under the coconspirator exception to the hearsay rule, they were admissible under section 93-401-7, R.C.M. 1947, which provides:

"<u>Declarations which are a part of the transaction</u>. Where, also, the declaration, act, or omission forms part of a transaction, which is itself the fact in dispute, or evidence of that fact, such declaration, act, or omission is evidence, as part of the transaction."

The state contends the coconspirator exception to the hearsay rule is available in this case, since the state prosecuted the case on the theory there was a conspiracy to commit robbery.  It is argued that, even though the crime of conspiracy was not charged as a separate offense in the Information, the state could properly present evidence to show there was a conspiracy.  Defendants urge the state is barred from utilizing

- 11 -

the coconspirator exception to the hearsay rule since the state did not charge defendants with the crime of conspiracy; that the state's evidence was insufficient to prove a conspiracy; and, that the hearsay statements testified to by Bushman were made after the conspiracy ended, if there was one, and were not made in furtherance of a conspiracy. We disagree with defendants' interpretation of the coconspirator exception to the hearsay rule.

The state may present evidence establishing a conspiracy even though the crime of conspiracy was not charged as a separate offense in the Information. State v. Dennison, 94 Mont. 159, 21 P.2d 63. Whether or not a conspiracy was proved for the purpose of permitting application of the coconspirator exception to the hearsay rule was a question to be decided by the district court. The existence of a conspiracy can be shown by circumstantial evidence. To establish a conspiracy it is not necessary to prove by direct evidence an agreement to commit a crime. State v. Alton, 139 Mont. 479, 365 P.2d 527; State v. Collins, 88 Mont. 514, 294 P. 957; State v. Hopkins, 68 Mont. 504, 219 P. 1106.

An examination of the record discloses that the district court made a finding, without a disclosure of its grounds, concerning the admissibility of extrajudicial statements made by a defendant against a nonpresent codefendant, by another codefendant. The court admitted the testimony, then admonished the jury by its Instruction No. 1 (heretofore cited in full) that the statement could not be used against a codefendant not present when the statement was made. This procedure was approved by the United States Supreme Court in Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L ed 2d 278. In Paoli a confession of one defendant was admitted inculpating the other defendants. A five-four Court approved the giving of a cautionary instruction, if sufficiently clear, and reasoned that it could be assumed

the jury would follow the court's instruction.

Yet, this started a series of cases based on the Sixth Amendment command that all defendants in a criminal prosecution shall enjoy the right to confront the witnesses against them. In 1968, Bruton presented a fact situation where Bruton was jointly tried with a codefendant named Evans and convicted of robbery. A postal inspector testified at trial that Evans had orally confessed to him and also implicated Bruton. The United States Supreme Court held this added substantial weight to the case in a form not subject to cross-examination, since Evans did not take the stand. The Court of Appeals, Eighth Circuit, 375 F.2d 355, set aside the Evans conviction for a "Miranda" violation but affirmed the conviction of the nonconfessor Bruton. The court relied on Paoli because the jury was instructed not to consider Evans' confession in determining Bruton's innocence or guilt.

The Supreme Court in Bruton specifically overruled Paoli and challenged the naive assumption the prejudicial effect of such testimony could be overcome by jury instructions. The Court held that since substantial weight was added to the government's case by the testimony in a form not subject to cross-examination, Bruton's Sixth Amendment right to confront witnesses against him was violated, and the violation was not cured by the court's instruction to disregard the testimony of the postal inspector concerning Evans' confession inculpating Bruton. For a case by case examination of the application of the "Bruton rule" see Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L ed 2d 284. In Harrington there are demonstrations of constitutional violations of the "Bruton rule", in Bruton type situations where it is not reversible error. We do not find these exceptions present in the fact situation in the instant case.

- 13 -

The United States Supreme Court has long recognized the right of the defendant to confront his witnesses at the time of trial. In Mattox v. United States, 156 U.S. 237, 242, 243, 15 S.Ct. 337, 39 L ed 409, 411, the Court said:

"The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. * * *"

The United States Court of Appeals in United States v. Adams, 446 F.2d 681, 683, cert. den. 404 U.S. 943, found the relevant factual inquiry in determining whether the Confrontation Clause is violated to be:

" * * * whether under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration."

The criteria to be considered in making this factual inquiry are: (1) the declarant's knowledge of the identities and roles of the other coconspirators; (2) the possibility that declarant was relying on faulty recollection; (3) the circumstances under which the statements were made, indicating declarant might be lying about the codefendant's involvement in the crime; (4) the possibility defendants could have shown by cross-examination the declarant's statements were unreliable; and (5) whether the testimony is so "crucial" to the prosecution or "devastating" to the defense as to require reversal of the conviction. United States v. Snow, 521 F.2d 730; United States v. Baxter, 492 F.2d 150, cert. den. 416 U.S. 940. Whether a defendant was denied the right to confront and cross-examine witnesses must be resolved case-by-case, based on an examination of all the circumstances

- 14 -

and evidence.  Arias v. United States, 388 F.Supp. 736.

There is little doubt that declarant Radi clearly knew Fitzpatrick's role in the alleged crime and the identities and roles of the other conspirators.  The events were fresh in his mind.  Yet, without discussing the truth and veracity of the declarant, we recognize that Radi had good reason to lie about who shot the victim.  Without Fitzpatrick present, Radi might easily persuade his coconspirators that all fatal shots were fired by Fitzpatrick and thus avoid some conceived criminal culpability.  In any event, we recognize the devastating effect this testimony would have upon a jury and hold, at least as to Fitzpatrick, there was a denial of the right to confront the declarant on cross-examination before the trier of fact.  The district court's instruction admonishing the jury was insufficient as far as offsetting any prejudice which resulted from the admission of the extrajudicial statements.  Bruton v. United States, supra; Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L ed 2d 1100.

We acknowledge the inherent discretion of the district court in determining whether defendants jointly charged with public offenses are to be provided separate trials or tried jointly.  However, we recognize a need for judicial guidelines in the instance where the prosecution intends to introduce into evidence the extrajudicial statement of one defendant that implicates a codefendant.  This issue was discussed in People v. Aranda, 63 C.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265, 272:

> "When the prosecution proposes to introduce
> into evidence an extrajudicial statement of
> one defendant that implicates a codefendant,
> the trial court must adopt one of the following
> procedures:  (1) It can permit a joint trial if
> all parts of the extrajudicial statements im-
> plicating any codefendants can be and are
> effectively deleted without prejudice to the
> declarant.  By effective deletions, we mean

not only direct and indirect identifications
of codefendants but any statements that could
be employed against nondeclarant codefendants
once their identity is otherwise established.
(2) It can grant a severance of trials if the
prosecution insists that it must use the extra-
judicial statements and it appears that effec-
tive deletions cannot be made. (3) If the
prosecution has successfully resisted a motion
for severance and thereafter offers an extra-
judicial statement implicating a codefendant,
the trial court must exclude it if effective
deletions are not possible. Similar rules
concerning joint trial have been adopted in
other jurisdictions and have been found work-
able. [Citing cases.]" 407 P.2d 272.

We are in agreement with the effect of these judicial guidelines.

Our final inquiry in this area of joinder concerns de-
fendants' contention the joinder of their trials denied them the
effective assistance of counsel. Defendants claim: (1) The
number of defendants and independent counsel made it impossible
to employ effective trial tactics; (2) one defendant or another
disqualified a district judge or challenged a juror that another
defendant would have allowed to remain in the case; (3) certain
counsel delved into areas on cross-examination that merely re-
peated the state's case against particular defendants; and (4)
all defendants, with the exception of Radi, elected to rest
their cases following the state's case-in-chief, thus compelling
Radi to rest. We note that most of these objections are of a
general nature and could be raised in almost any multiple de-
fendant-counsel proceeding. It would be most unusual, in our
opinion, if four defense counsel representing individual clients
did agree on every question of trial tactics. Further, a de-
fendant has no right to have his case tried by a specific judge
or have a particular person sit on his jury. State v. Moran,
142 Mont. 423, 384 P.2d 777.

In concluding discussion of the issue of joinder, we
reiterate our position. Defendants incurred substantial preju-
dice through the joinder of their trials because of a failure

- 16 -

to protect individual defendant's right to confrontation. We fully realize the benefits of joint trials, specifically, the conservation of state funds, diminished inconvenience to witnesses and public authorities, and the avoidance of delay in bringing those accused of crime to trial. Yet, where we obtain speed, economy and convenience in the administration of the law at the cost of fundamental constitutional rights, that price is too high. Trial courts must examine joinder of defendants' trials more closely, particularly where separate counsel is required because of potential conflicts of interest between the defendants.

Issue III. This issue attacks the sufficiency of evidence which the state presented to corroborate Bushman's testimony. Section 95-3012, R.C.M. 1947, provides:

> "Testimony of person legally accountable. A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense, as defined in section 94-2-106, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the one responsible or legally accountable for the same offense, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, it merely shows the commission of the offense, or the circumstances thereof."

In State v. Orsborn, ____Mont.____, 555 P.2d 509, 514, 33 St.Rep. 935, 940, this Court said:

> "State v. Cobb, 76 Mont. 89, 92, 245 P.2d 265, has been cited many times as to the general guidelines for determining the sufficiency of evidence corroborating the testimony of one legally accountable. Though Cobb was decided under section 11988, R.C.M. 1921, since repealed, the language of the old statute is nearly identical to that of section 95-3012, R.C.M. 1947, in pertinent part. * * *"

State v. Cobb, 76 Mont. 89, 92, 245 P. 265, set out these general rules:

> "(a) The corroborating evidence may be supplied by the defendant or his witnesses.
>
> "(b) It need not be direct evidence—it may be circumstantial.
>
> "(c) It need not extend to every fact to which

- 17 -

the accomplice testifies.

"(d) It need not be sufficient to justify a conviction or to establish a prima facie case of guilt.

"(e) It need not be sufficient to connect the defendant with the commission of the crime; it is sufficient if it tends to do so.

"(f) Whether the corroborating evidence tends to connect the defendant with the commission of the offense is a question of law, but the weight of the evidence--its efficacy to fortify the testimony of the accomplice and render his story trustworthy--is a matter for the consideration of the jury."

At trial the state presented two minor girls who testified they were with all five defendants on the day of the robbery and murder. The girls testified all five defendants planned to go to Hardin and the girls themselves accompanied Bushman, Bad Horse and Holliday on the trip to Hardin and the return trip to Billings, at about midnight on April 5, 1975; that Fitzpatrick and Radi were in Radi's automobile at a service station in Billings just before Bushman, Holliday, Bad Horse and the two girls left for Hardin; that Radi's automobile passed them on the highway to Hardin; and that two men, who the girls presumed to be Radi and Fitzpatrick, got out of Radi's automobile in Hardin. Both girls testified they observed a hole in the windshield of Radi's automobile on the morning following the crimes.

Carol Broach testified Bushman, Bad Horse and Holliday were in Hardin from approximately 10:45 p.m. to midnight on April 5, 1975; that she returned to Billings with these three defendants and the two minor girls; and, that this group arrived at Radi's house at approximately 2:00 a.m. on April 6, 1975.

Raleigh Kraft, Jr. testified he had discussed with Bushman and Bad Horse the possibility of robbing the Safeway store.

- 18 -

Ronald Potts and Lyle Doane testified they were customers at the Safeway store on the evening of April 5, 1975, and observed an automobile, blue or green in color, parked in front of the Safeway store, with two male occupants approximately the same ages as Radi and Fitzpatrick. Radi's automobile was metallic blue in color.

Agent Dieckman of the Federal Bureau of Investigation testified Fitzpatrick was arrested in Spokane, Washington on June 3, 1975, and Fitzpatrick told him he had been drinking with Radi in Billings on the evening of April 5. The witness established that Fitzpatrick used a fictitious name while in Spokane and possessed a newspaper clipping stating Fitzpatrick was wanted by the police for the crimes committed in Hardin on April 5, 1975.

Robert Balko, employed by Nyquist Financial Services in Billings, testified Radi indicated in a conversation with him that someone had shot a hole through his windshield. The testimony of Mary Jenkins and Helen Jones established that Radi had changed his Montana automobile license plates for Nevada license plates shortly after the crimes.

Roger Asbury of the Federal Bureau of Investigation testified the bullet found in Radi's automobile was fired from the same gun as the slug found in the victim's automobile and the slug which killed the victim.

This evidence sufficiently corroborates Bushman's testimony.

Issue IV. The final issue we will consider is whether the convictions of defendants Holliday and Bad Horse should be reversed on the ground the jury was inadequately instructed on the applicable law and returned inconsistent verdicts. Holliday and Bad Horse contend that since the state prosecuted its case

on the theory of conspiracy it is logically inconsistent to find them guilty of robbery, but not guilty of deliberate homicide and aggravated kidnapping. In support of this contention defendants direct our attention to the court's Instruction No. 28, an instruction on the felony-murder doctrine, which provided:

> "You are instructed that when two or more persons agree to commit a crime under such circumstances as may * * * result in the taking of human life, either in the furtherance of, or the resistance to their unlawful agreement, then each party * * * will be held responsible for the consequences which might reasonably be expected to flow * * * from carrying into effect their unlawful agreement * * *.
>
> "The law is that, if two or more persons agree to commit a felony and death happens in the furtherance of the common object, all are alike guilty of the homicide. The act of one of them done in the furtherance of the original design, in the contemplation of the law, is the act of all. And if such an agreement is to do or perform an unlawful act constituting a felony, and in the prosecution of such unlawful act constituting a felony, an individual is killed, such killing is deliberate homicide."

A general principle of law is that consistency in criminal verdicts is unnecessary. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L ed 356. Where two or more defendants are tried together in a criminal case the verdicts need not demonstrate rational consistency. United States v. Anderson, 509 F.2d 312, cert. den. 420 U.S. 991. The United States Supreme Court explained the rationale for the Dunn holding when it said:

> "That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." 284 U.S. 394.

Defendants Holliday and Bad Horse distinguish Dunn from the instant case. They contend the jury in Dunn correctly followed the instructions of law given to it in reaching that verdict, but the jury here when finding Holliday and Bad Horse not guilty on two counts and guilty on the other count, completely

- 20 -

disregarded Instruction No. 28 and relied on Instruction No. 36 which provided the jury might "find any one of the following verdicts" as to each defendant:

"1.   Guilty of Count One, deliberate homicide;

"2.   Not guilty of Count One, deliberate homicide;

"3.   Guilty of Count Two, aggravated kidnapping;

"4.   Not guilty of Count Two, aggravated kidnapping;

"5.   Guilty of Count Three, robbery;

"6.   Not guilty of Count Three, robbery."

The jury verdicts returned in this case can be distinguished from the inconsistent verdicts which were the subject of the general rule announced in Dunn.  These verdicts are not merely inconsistent, they are legally unsupportable.  This case was prosecuted on a conspiracy to commit robbery theory and each defendant prosecuted under the felony murder rule or doctrine which contemplates, as set forth in the trial court's Instruction No. 28, that each defendant is guilty of deliberate homicide or must be acquitted.

This jury was improperly and inadequately instructed on that point of law and could not reach a proper verdict. State v. Bean, 135 Mont. 135, 337 P.2d 930; State v. Jackson, 88 Mont. 420, 293 P. 309.

The inconsistency between the court's Instruction No. 28 and Instruction No. 36 is apparent and the resulting confusion in the minds of the jury is evidenced by its request for clarification of Instruction No. 28:

"Question on Instruction #28

"If we find one defendant guilty of robbery
does Inst. No. 28 require guilty verdict on
two remaining counts."

The district court responded:

"Instruction number 36 answers this question."

No further clarification was provided, the jury completed

deliberation and reached its verdict.

This Court has held that the need for giving additional instructions to the jury is a matter of district court discretion. State v. Hawkins, 165 Mont. 456, 529 P.2d 1377. However, here the jury was directed to examine Instruction No. 36, which is an improper instruction contrary to the law of the case. The court should have further instructed the jury in a manner that would sufficiently and clearly present the applicable law. Such failure is reversible error.

The judgments of conviction of all defendants are reversed. The causes are remanded to the district court for new trials.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

- 22 -

Mr. Justice John Conway Harrison concurring in part and dissenting in part:

I concur with the majority's opinion as to all defendants except Radi whose conviction I would affirm. By his own statements he was one of two men who kidnapped a young man (who unlike any of the defendants worked for a living), took him outside his hometown robbed and ruthlessly murdered him. In Radi's case it makes little or no difference who fired the shots, for his very acts in participating in the kidnapping and robbery make him a principal to the murder.

As to Fitzpatrick, who was not present at the time of Radi's statement on who fired the shots, this Court is compelled to follow the decision of the United States Supreme Court in Bruton v. United States, supra, and its progeny. To do otherwise would be to delay the ultimate decision on retrial. Bruton is based upon the right of defendant Fitzpatrick, guaranteed by the Sixth and Fourteenth Amendments, to cross-examine witnesses. Bruton thus held that, in a joint trial where one defendant did not take the stand the introduction of his extrajudicial confession which incriminated the second defendant, violated the second defendant's Sixth and Fourteenth Amendment rights even though the jury was instructed the confession was not to be considered against him.

Subsequent cases illustrate Bruton does not invalidate use of codefendant statements in all joint trial situations. When, for example, the declarant codefender takes the stand and subjects himself to cross-examination, there is no infringement of any constitutional right to cross-examine. Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L ed 2d 222. The Bruton rule cannot

- 23 -

be invoked by a defendant who insists upon a joint trial, knowing the prosecution intends to use codefendants' inculpatory statements. United States v. Sullivan, 435 F.2d 650, cert. denied 402 U.S. 912, 91 S.Ct. 1392, 28 L ed 2d 654. See also Anno. 29 L ed 2d 931, 989, §8.

If the inculpatory codefendant's confession is admissible under an exception to the hearsay rule, as for example an admission of a coconspirator, the Bruton rule will not be invoked. United States v. Kelley, 526 F.2d 615,620. Also where extra-judicial statements of both defendants interlock, and do not conflict on vital points, courts have held that no reversal is required. United States ex rel. Stanbridge v. Zelker, 514 F.2d 45.

For the above reasons I would confirm as to defendant Radi.

John Conway Harrison
Justice.